Argued and submitted March 31, reversed and remanded for new trial
July 15, 1998

# STATE OF OREGON,
*Respondent,*

*v.*

# RALPH ADRIAN WYATT,
*Appellant.*

(CR9501237; CA A95425)

962 P2d 780

Ronald H. Hoevet argued the cause for appellant. With him on the brief was Hoevet & Snyder, P. C.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Armstrong, Judges.

HASELTON, J.

## HASELTON, J.

Defendant appeals from his convictions for rape in the first degree, ORS 163.375, sexual abuse in the first degree, ORS 163.427, and delivery of a controlled substance to a minor, ORS 475.995. He asserts, in part, that the trial court erred in precluding the testimony of a defense expert witness, Grimsbo, as a sanction for an alleged violation of the reciprocal criminal discovery statutes, ORS 135.835 and ORS 135.845, without adequately considering the prejudice to the state from the alleged violation and the availability of less onerous alternatives. We agree that the trial court erred in not assessing the availability of less onerous alternatives and conclude that that error was not harmless. Accordingly, we reverse and remand for a new trial.

Defendant's convictions all arise from his alleged conduct toward his stepdaughter on the evening and early morning of July 23-24, 1995. The preclusion of Grimsbo's testimony occurred during defendant's second trial, in July 1996; the first trial, in March and April 1996, ended with a hung jury. Although the parties obviously dispute whether defendant engaged in the alleged criminal conduct, the circumstances of the court's preclusion of Grimsbo's testimony are largely uncontroverted.

Defendant married the complainant's mother, Carol Wyatt, in August 1990 and moved into the house that Wyatt shared with complainant and two other children from a previous marriage. The marriage was unstable, primarily because of disagreements over financial matters, and, by the spring and summer of 1995, they were discussing divorce. On occasion, their domestic disputes became violent.[1]

On July 23, 1995, complainant was nine years old. Because complainant had not been able to go camping with her brothers earlier in the summer, she wanted to camp out in the front yard with defendant, and Wyatt agreed. At about 10:00 that night, defendant and complainant went out to a pup tent they had pitched and roasted marshmallows and

---

[1] On July 25, 1995, Wyatt applied for, and obtained, a domestic abuse restraining order, based on an incident in a grocery store parking lot in early July 1995.

talked. After complainant went to sleep, she awoke twice, and defendant gave her at least one pill on each occasion. The parties dispute the nature of those pills; defendant testified that they consisted of a nonprescription herbal sleep aid called "Silent Night"; the state asserted that defendant gave complainant a much more powerful narcotic.

The next morning, July 24, defendant left for work at around 7:00. By that time, complainant was back in her bed in the house. At around 9:00, defendant called the house and talked to one of his stepsons; at that time complainant was still asleep. About an hour later, at around 10:00, Wyatt called defendant at work, told him that complainant had been drugged and probably raped, and either accused defendant, or asked him, whether he had raped complainant.[2]

Complainant's pediatrician, Dr. Joan Sage, examined her at 2:00 on the afternoon of the 24th.[3] Sage examined complainant and noted bleeding and irritation in the vaginal area and "almost non-existent hymenal tissues." Consequently, Sage referred complainant to Dr. Leila Keltner at the CARES[4] program at Emanuel Hospital for an emergency examination. When complainant arrived at the hospital she was throwing up, her coordination and vision were impaired, and her responses were very slow.

Keltner spoke with Wyatt, who told her that complainant had slept outside with defendant; that complainant had been very sleepy that morning; that complainant had complained of pain; and that she had found blood in the underpants that complainant had been wearing while camping the night before. Wyatt, who had placed the underpants in a bag, gave them to Keltner.

---

[2] The parties dispute Wyatt's basis for, and possible motivation for, such an accusation. That dispute, which is central to the underlying prosecution, is discussed below.

[3] As Wyatt was driving complainant to that appointment, she stopped at her bank and transferred all the funds, $30,000, from a joint account she and defendant maintained, into an account in her name only.

[4] The acronym "CARES" stands for Child Abuse Response and Evaluation Services.

Keltner conducted an examination and determined that complainant had sustained acute trauma with lacerations, bleeding, and bruising of the hymen and that those injuries could be "very consistent with multiple episodes of penetration" occurring over a short period of time. Keltner also used a rape kit to collect swabs and arranged for a urine toxicology screen, which showed the presence of morphine, codeine, oxycodene, and acetaminophen.

Keltner asked complainant whether anyone had touched her genital area, and complainant responded that, while she and defendant had been camping and he thought she was sleeping, he had placed his hand over that area. At that time, complainant had been completely clothed. Complainant also said that twice during the night defendant had given her pills that had made her feel sleepy and that he had told her not to tell her mother.

After the examination, Keltner turned complainant's underwear over to a Clackamas County sheriff's deputy. Deputies later seized two sleeping bags, one from defendant's car and the other from the laundry room of the family home. Testing revealed no sperm, seminal fluid, or blood on the sleeping bags and no sperm, seminal fluid, or pubic hairs on the swabs of complainant's vagina. There was no seminal fluid on the complainant's underpants, but there were a small number of sperm[5] and some epithelial cells[6] in the crotch of the underpants. It is uncontroverted that the sperm found on the underpants was defendant's.

It is, thus, uncontroverted that: (a) The drug screen of complainant's urine revealed the presence of narcotic substances not found in "Silent Night"; (b) complainant's vagina had been subjected to multiple penetrations, with injuries that were consistent with penetration of a penis or penis-like object; and (c) there was blood and defendant's sperm on complainant's underpants. The central dispute—the dispositive

---

[5] The state's expert found 80 sperm. Defendant's expert, who examined a smaller area, found two.

[6] Epithelial cells are the cells that constitute the coverings of internal and external bodily structures, including glands. Such cells are commonly found in blood, saliva and vaginal secretions. *See generally Stedman's Medical Dictionary*, 587 (26th ed 1995).

dispute on which both of defendant's two trials depended—is whether defendant perpetrated those crimes, or whether Wyatt, motivated by a desire to prevent defendant from recovering anything in the impending divorce, "framed" defendant by staging the crime.

Defendant was first tried in March and April 1996. The state's theory was straightforward: Defendant had drugged complainant and then raped her. As support for that theory, the state relied substantially, albeit not exclusively, on complainant's, Wyatt's, and Keltner's testimony, as well as that of forensic experts, Kevin Humphries of the Oregon State Police Crime Lab, who tested and analyzed the sleeping bag, underpants, and swabs, and Susan Hormann, a specialist in serology and DNA testing at the OSP Crime Lab. Complainant had no memory of a rape and, with a few variations, generally reiterated the account she had given to Keltner and to law enforcement personnel. Wyatt testified that she had great difficulty rousing complainant on the morning of the 24th, that complainant had obviously been drugged, and that, when she took off complainant's underwear, she saw blood on the underpants. Wyatt also testified that, when she subsequently called defendant and told him that complainant had been drugged and probably raped, he responded, "You'll never be able to prove that I did it. You won't find any sperm."[7]

Humphries testified as to his findings and explained that it was not unusual for swabs to test negative for the presence of seminal fluid, especially if blood is present. Humphries also stated that the small number of sperm on complainant's underpants was explainable in that such findings are not unusual in cases involving children. Hormann, in the first trial, testified that the " 'sperm fraction' from the panty crotch was consistent with the sperm from [defendant] and * * * carry-over epithelial cells consistent with [complainant]." Hormann did not explicitly exclude the possibility that the epithelial cells could have come from Wyatt's body.[8]

---

[7] Wyatt also testified that she had withdrawn the money from the joint account on July 24, while driving complainant to the doctor, because defendant had previously made large withdrawals from that account and she was afraid that he would do so again and abscond.

[8] In response to a hypothetical during the state's case-in-chief, Hormann generally discounted defendant's "transferred sperm" hypothesis (discussed below).

Defendant's theory throughout was that Wyatt had staged the crime. In particular, defendant testified that, on the evening of July 23, before he and complainant camped out, he and Wyatt had engaged in sexual intercourse.[9] The defense asserted that, motivated by greed and hatred, Wyatt, a registered nurse, had "framed" defendant by drugging complainant after she came back inside the house on the morning of the 24th, assaulted complainant with a blunt object, and then applied the sperm she had saved from the night before to complainant's underpants. The defense emphasized the animosity between Wyatt and defendant, their disagreements over finances, Wyatt's alleged "looting" of the joint account, the lack of any prior sexual advances or contact between defendant and complainant, the absence of any blood, seminal fluid, or sperm on the sleeping bag, the absence of seminal fluid, sperm, or pubic hair on the vaginal swabs, and the absence of seminal fluid on the underpants. In closing argument, defense counsel repeatedly alluded to the "transferred sperm" hypothesis.

The jury in the first trial could not reach a verdict after four days of deliberations. Defendant was retried in July 1996. In early May 1996, in anticipation of the retrial, the state's DNA expert, Hormann, prepared a report that specifically addressed the "transferred sperm" hypothesis and, particularly, determined that, based on DNA typing, the epithelial cells found on complainant's underpants could not be Wyatt's. The implication of Hormann's report was that the sperm could not have been transferred from Wyatt's body. The state promptly provided Hormann's report to defense counsel. Defense counsel requested Hormann's handwritten notes, which underlay her report, and the state provided those materials shortly before trial.

At the second trial, the parties' positions and proof paralleled those in the first trial.[10] However, Hormann's testimony controverting the "transferred sperm" theory was

_____

However, on cross-examination Hormann acknowledged that, although the epithelial cell fraction was consistent with complainant's DNA, she did not specifically analyze the underpants for the presence of Wyatt's DNA.

[9] Wyatt denied that they had had intercourse and, to substantiate that denial, produced a chart she maintained of her menstrual cycles.

[10] We use the description "paralleled" quite consciously—*i.e.*, there were some variations, additions, and refinements of proof, particularly with respect to pharmacological issues, but the gist was *generally* the same.

much more focused and rigorous than her general observations in the first trial.[11] Hormann testified:

> "[T]his stain could not be Carol Wyatt. The epithelial cells I found in the panty crotch are not Carol Wyatt's either because she has a B at this side, or locuses, and we're not seeing that. We're seeing an AB here, and we're only seeing a B in here. And she also doesn't have a 1.3 to contribute.
>
> "* * * * *
>
> "Q. [by the prosecutor]: If Ralph Wyatt and Carol Wyatt had consensual sexual intercourse the evening of July 23rd, 1995, and then she somehow extracted the sperm from her vagina and planted it in her daughter's underwear, would you expect to find her epithelial cells in that sample?
>
> "A. Yes I would.
>
> "Q. Did you?
>
> "A. No I did not.
>
> "Q. Given that same scenario * * * would there be a logical explanation for how her epithelial cells could be somewhere else on the underwear but not on the sample with the sperm that was retrieved from this alleged act of intercourse?
>
> "A. Not that I can think of. They would be intermixed. And where the sperm would go, you would expect the epithelial cells to go kind of as a mixture."

After Hormann testified on the second day of trial, July 10, defense counsel told the prosecutor that he might call Ray Grimsbo as a defense witness. Grimsbo, a forensic scientist, was not listed on the defense witness list. Defense counsel did not, at that time, describe the nature of Grimsbo's anticipated testimony. About 8:00 on the evening of the third day of trial, July 11, the prosecutor called defense counsel and asked whether he, in fact, intended to call Grimsbo as a witness. Defense counsel told the prosecutor that he "did not think" that he would call Grimsbo but "was not certain." Thereafter, defense counsel reconsidered and, later that evening, left a telephone message at the district attorney's office,

---

[11] *See* 155 Or App at 197 n 8.

which the prosecutor received at 6:30 on the morning of the fourth day of trial, July 12.

When court began that morning, the trial judge apparently indicated in chambers that he was inclined to exclude Grimsbo's testimony. Defense counsel then made the following offer of proof:

"Mr. Grimsbo would have testified that although small amounts of ejaculate in certain situations is not unusual, it is also possible that sperm could have been transferred from another consensual sexual intercourse act from—with another person, and that during that transfer process when such a small sample as 80 sperm were transferred, it would have been not unusual not to have found the DNA of the female participant in that additional act on the sample.

"Specifically in this case, I would have had him address the fact that 80 sperm were found in the underwear of [complainant], and given him a hypothetical question involving a consensual act between Mr. Wyatt and Mrs. Wyatt the night before. I believe and I'm certain, given my conversations with him, his testimony would have been that in a full ejaculation of a normal male, there would have been over 300,000 sperm in the sample and therefore there would not have been a complete mixing of the DNA when such a small sample as 80 were transferred; the absence of the female's DNA would not be unusual."

The prosecutor objected to Grimsbo's testimony "on the basis that it's a violation of discovery"—*i.e.*, the reciprocal discovery provisions of ORS 135.835 and ORS 135.845.[12] The

---

[12] ORS 135.835 provides, in part:

"Except as otherwise provided * * *, the defendant shall disclose to the district attorney the following material and information within the possession or control of the defendant:

"(1) The names and addresses of persons, including the defendant, whom the defendant intends to call as witnesses at the trial, together with relevant written or recorded statements or memoranda of any oral statements of such persons other than the defendant."

ORS 135.845 provides:

"(1) The obligations to disclose shall be performed as soon as practicable following the filing of an indictment or information in the circuit court * * *. The court may supervise the exercise of discovery to the extent necessary to insure that it proceeds properly and expeditiously.

"(2) If, after complying with the provisions of ORS 135.805 to 135.873, a party finds, either before or during trial, additional material or information

prosecution noted that, because the state had produced Hormann's report and notes, defense counsel "had plenty of time to know what Mrs. Hormann was going to testify to, the issues involved." The prosecutor continued:

> "And for us to adequately prepare for Mr. Grimsbo's testimony, it would necessitate having Mrs. Hormann here, at a minimum, and we have not prepared to do that because we didn't have anything but a possibility that he may be called as a witness."

Defense counsel responded that, notwithstanding his receipt of Hormann's report and notes, "the clarity of the issue and the need for Mr. Grimsbo's testimony was not clear to me until after she testified." The trial court precluded Grimsbo's testimony:

> "[G]iven the stage of the proceedings, that the potential for Mr. Grimsbo's testimony should have been obvious earlier in the proceeding, there's a lack of notice to the State, and that evidence would be excluded."

After defendant was convicted, he moved for a new trial based, in part, on the exclusion of Grimsbo's testimony. Defendant contended that the nondisclosure of Grimsbo at an earlier time was not a discovery violation. The parties also argued at length over whether, in retrospect, the state would have suffered actual prejudice if Grimsbo had been permitted to testify and potential alternatives for mitigating any such prejudice.

The court denied the motion, concluding that, because of defense counsel's receipt of Hormann's report and because of the significance of the "transferred sperm" hypothesis, defendant's failure to list Grimsbo as a witness before the second trial constituted a discovery violation:

> "Dr. Grimsbo is a witness who, regardless of what [Ms.] Hormann testified to, the position of the defendant is there would not have been epithelial cells present because of the quantity of Mr. Wyatt's sperm that were—was found would have been a point the defendant would have intended to offer regardless of what [Ms.] Hormann said."

---

which is subject to or covered by these provisions, the party must promptly notify the other party of the additional material or information."

The court continued:

> "The issue of whether or not sanctions less than exclusion were available and in deciding that they weren't, I think it relates to the information Mr. Shepley contends he had from Dr. Grimsbo, his opportunity to provide that information to the State at an earlier date, and the stage of the proceedings."

■ On appeal, defendant assigns error to the court's preclusion of Grimsbo's testimony.[13] Defendant contends, particularly, that there was no discovery violation because Grimsbo was identified as a witness as soon as the need for his testimony was apparent. Defendant further contends that, in all events, the trial court did not determine that (a) there was actual prejudice to the state from the alleged violation; and (b) no means short of complete preclusion would remedy any such prejudice. Assuming, without deciding, that there was a discovery violation and that the state would have suffered actual prejudice from Grimsbo's testimony, we nevertheless conclude that the trial court erred in failing to consider whether any prejudice could have been remedied through less onerous means.

■ We review the trial court's imposition of discovery-related sanctions under ORS 135.865[14] for abuse of discretion. *State v. Lindquist*, 141 Or App 84, 89, 917 P2d 510 (1996). However, in exercising its discretion to exclude a witness:

> "[t]he trial court must find (1) actual prejudice to the other party and (2) that 'no other sanction short of exclusion would remedy' that prejudice."

■ *Id.* (quoting *State v. Johanesen*, 110 Or App 348, 351, 822 P2d 154 (1991)). *See also State v. Moss*, 147 Or App 658,

---

[13] Defendant also assigns error to an alleged error in polling the jury. Given our disposition, we do not reach that matter.

[14] ORS 135.865 provides:

> "Upon being apprised of any breach of the duty imposed by the provisions of ORS 135.805 to 135.873, the court may order the violating party to permit inspection of the material, or grant a continuance, or refuse to permit the witness to testify, or refuse to receive in evidence the material not disclosed, or enter such other order as it considers appropriate."

663, 938 P2d 215, *rev den* 325 Or 491 (1997). Failure to consider alternatives, short of complete preclusion of the witness's testimony, generally warrants reversal. *See, e.g., State v. Ben*, 310 Or 309, 318-19, 798 P2d 650 (1990); *Johanesen*, 110 Or App at 351-52; *State v. Girard*, 106 Or App 463, 470, 808 P2d 1017 (1991); *State v. Gill*, 96 Or App 358, 361-62, 772 P2d 957 (1989).

Here, the prosecutor, in moving to preclude Grimsbo's testimony, identified only one type of prejudice: "To adequately prepare for Grimsbo's testimony, it would necessitate having Mrs. Hormann here, at a minimum, and we have not prepared to do that * * *." There is no showing in this record that Hormann was, in fact, unavailable—much less *how* unavailable she might have been. That is, there was no showing of where Hormann was, of how long it might take to secure her presence, or of how much time she might need to prepare to respond in rebuttal to Grimsbo's testimony. Nor was there any consideration of the feasibility of a continuance and the extent to which such a continuance might have mitigated the state's asserted prejudice. In that regard, this case is indistinguishable from *Lindquist*, 141 Or App at 90 (preclusion of witness was erroneous where court "never considered how much time the state needed to investigate [the witness's] story"); *Johanesen*, 110 Or App at 351 (preclusion was erroneous where court did not "determine what additional time the state would need to prepare its challenge to the defense evidence"); or *Gill*, 96 Or App at 361 (preclusion was erroneous where "the trial court made no inquiry as to whether the prejudice claimed by the state could be cured by an interview with the witness, a brief recess in the trial or a post-ponement").

Moreover, even assuming that the record of the new trial motion proceedings is somehow pertinent to our review of the court's ruling at trial,[15] the court, in that context, did not "meaningfully consider the benefits and detriments of sanctions or remedies short of exclusion." *Johanesen*, 110 Or App at 351. Rather, the court only generally referred to "the

---

[15] That proposition is, at least, problematic. Logically, the court's exercise of discretion should be assessed by reference to what the court knew at the time it made the disputed ruling.

stage of the proceedings." *Compare Moss*, 147 Or App at 663 (trial court "expressly, and in detail, considered alternatives to exclusion and concluded for reasons stated that the sanction of exclusion was the only meaningful sanction available on the facts of this case").

■ The state asserts, nevertheless, that any error was harmless. *See, e.g., State v. Perez*, 135 Or App 433, 437, 899 P2d 722 (1995) (rejecting contention that preclusion of defense witness was harmless error); *State v. Fain*, 132 Or App 488, 492-93, 888 P2d 1052 (1995) (same). The state emphasizes the strength of the prosecution's case and asserts that defendant's "transferred sperm" scenario was "fantastic" and depended, ultimately, on defendant's credibility, which the jury necessarily rejected.

Based on our review of the record, we cannot say that there is little likelihood that Grimsbo's testimony would have affected the verdict. However "fantastic" the "transferred sperm" hypothesis might seem, at least to the state, the jury in the first trial could not agree on guilt. In the first trial, the state had not focused on, and exploited, the "gap" in the "transferred sperm" theory—the absence of Wyatt's DNA. In the second trial, through Hormann, it did. Grimsbo's testimony, if believed, would have explained that seemingly inexplicable "gap." The error was not harmless.

Reversed and remanded for a new trial.