Argued and submitted March 10, affirmed October 29, 2008

RALPH A. WYATT,
*Petitioner-Respondent,*

*v.*

Stan CZERNIAK,
Superintendent,
Oregon State Penitentiary,
*Defendant-Appellant.*

Marion County Circuit Court
02C12412; A130961

195 P3d 912

Jennifer S. Lloyd, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Laurie Bender argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Edmonds, Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

The state appeals the post-conviction court's allowance of post-conviction relief, ordering a new trial, on the ground that petitioner received inadequate assistance of trial counsel. The state, while acknowledging that petitioner's trial counsel did not exercise reasonable professional judgment or skill in certain regards, maintains that the post-conviction court erred in determining that petitioner was prejudiced by his counsel's inadequate assistance. As explained below, we conclude that the post-conviction court did not err in that determination and, accordingly, we affirm.

Before addressing the substance of petitioner's operative specifications of inadequacy of counsel, and the state's challenges to the post-conviction court's analysis and disposition, we place the present dispute in uncontroverted context. In July 1996, petitioner was convicted, following a jury trial, of three counts of first-degree rape, ORS 163.375, one count of first-degree sexual abuse, ORS 163.427, and one count of delivery of a controlled substance to a minor, *former* ORS 475.995 (2003), *renumbered as* ORS 475.906 (2005). We recount in detail below the circumstances of those convictions, as pertinent to petitioner's claims of post-conviction relief.

On direct appeal from those convictions, petitioner argued, in part, that the trial court had erroneously excluded the testimony of a putative defense witness, Dr. Ray Grimsbo, as a discovery sanction because defense counsel had not complied with the requirements of ORS 135.835[1] and ORS 135.845[2] with respect to Grimsbo's testimony. *State v.*

---

[1] ORS 135.835 provides, in part:

"Except as otherwise provided * * *, the defense shall disclose to the district attorney the following material and information within the possession or control of the defense:

"(1) The names and addresses of persons, including the defendant, whom the defense intends to call as witnesses at the trial, together with relevant written or recorded statements or memoranda of any oral statements of such persons other than the defendant."

[2] ORS 135.845 provides, in part:

"(1) The obligations to disclose shall be performed as soon as practicable following the filing of an indictment or information in the circuit court * * *. The court may supervise the exercise of discovery to the extent necessary to insure that it proceeds properly and expeditiously."

*Wyatt,* 155 Or App 192, 962 P2d 780 (1998) (*Wyatt I*), rev'd, 331 Or 335, 15 P3d 22 (2000) (*Wyatt II*). We concluded that the trial court had erred because, even assuming that there was a discovery violation, "the trial court erred in failing to consider whether any prejudice [to the state from the violation of the reciprocal discovery statutes] could have been remedied through less onerous means." *Id.* at 202. We further concluded that the error required reversal because "[b]ased on our review of the record, we cannot say that there is little likelihood that Grimsbo's testimony would have affected the verdict." *Id.* at 204.

On review, the Supreme Court reversed, and reinstated defendant's convictions. *Wyatt II,* 331 Or 335. The court did not address the substance of our analysis but held, instead, that the propriety of the trial court's preclusion of Grimsbo's testimony as a discovery sanction had not been preserved for our review because defense counsel had failed to object to that sanction or to advocate for a less onerous sanction. Specifically, the "failure to object to the particular sanction imposed by the judge or, in the alternative, to argue for some other sanction, fails to preserve a claim on appeal that the judge erred in failing to consider the availability of a less onerous sanction." *Id.* at 343 (footnote omitted).

Petitioner then brought this action, raising a battery of allegations of inadequacy of trial counsel. Two are pertinent:

"(1) Trial counsel failed to timely advise the prosecution that expert witness, Dr. Ray Grimsbo, would be called to rebut the opinion testimony of Susan Hormann * * *. This violation resulted in the exclusion of Dr. Grimsbo's testimony, which was crucial to rebut the testimony of Ms. Hormann. * * *

"* * * * *

"(3) Trial counsel failed to request that the trial court impose a lesser sanction, other than the exclusion of Dr. Grimsbo's testimony, which if the court had allowed,

---

"(2) If, after complying with the provisions of ORS 135.805 to 135.873 and 135.970, a party finds, either before or during trial, additional material or information which is subject to or covered by these provisions, the party must promptly notify the other party of the additional material or information."

would have allowed Dr. Grimsbo to testify at trial; but if denied, would have preserved the issue for review on appeal."

The post-conviction court, after receiving evidentiary submissions from the parties, agreed with petitioner that trial counsel had been deficient in each of those respects and that those defaults by counsel resulted in such prejudice as to require a new trial:

"At the time defense counsel failed to act and considering all the circumstances, counsel should have been aware that the testimony of the expert defense witness was essential to an effective defense, should have disclosed the expert, and, having failed to disclose the expert should have objected to the trial court's error in failing to consider and select a less draconian, but still sufficient sanction for the error of counsel.

"The Court of Appeals' rationale for finding that the trial court's error was not harmless demonstrates the prejudicial nature of counsel's error. *State v. Wyatt*, 155 Or App 192, 204, 962 P2d 780 (1998). The court stated, 'we cannot say that there is little likelihood that [the expert defense witness's] testimony would have affected the verdict. However "fantastic" the [defense theory] might seem * * * the jury in the first trial could not agree on guilt.' *Id.* at 204. In the second trial, the prosecution altered the testimony of its expert witness from that in the first trial in order to exploit what appeared to be a 'gap' in the defense theory. Had the expert defense witness been able to testify and been believed, he could have explained this otherwise 'seemingly inexplicable "gap." ' *Id.* at 204."

(Brackets and ellipsis in original.)

■■■ In order to prove prejudice of a constitutional magnitude, a petitioner must show that counsel's advice, acts, or omissions had a tendency to affect the result of the prosecution. *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995). Whether a petitioner has demonstrated prejudice is a question of law that, in turn, may depend on the post-conviction court's findings of fact. *Ashley v. Hoyt*, 139 Or App 385, 395 n 8, 912 P2d 393 (1996). We are bound by the post-conviction court's factual findings if they are supported by evidence in the record. *Cunningham v. Thompson*, 186 Or

App 221, 226, 62 P3d 823, *modified on recons*, 188 Or App 289, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004). As explained below, we conclude that the post-conviction court's finding of prejudice was correct as a matter of law, and its factual findings are supported by evidence in the record.

Against that general backdrop, we return to the particular circumstances of petitioner's criminal trial, including the evidence presented at trial, because the state's "no prejudice" contention on this appeal must be assessed in light of those facts, as well as additional evidence adduced in the post-conviction trial. Many of the same facts were recounted in our opinion in *Wyatt I*.

Petitioner's convictions arose from events that occurred in July 1995. Petitioner was married to the victim's mother, Carol Wyatt. Petitioner and Carol Wyatt had a history of domestic disputes, and were contemplating divorce at the time of those events. *Wyatt I*, 155 Or App at 194. On the evening of July 23, petitioner and the nine-year-old victim camped out in a tent in the yard of their home. The victim testified that she awoke twice during the night and that, on each of those occasions, petitioner gave her pills. *Id.* at 194-95. The following morning, after petitioner went to work, Carol Wyatt called him and told him that the victim had been drugged and probably raped, and accused petitioner of having raped the victim. *Id.* at 195.

Later that day, the victim was examined, first by a pediatrician, and later by the CARES program.[3] The pediatrician noted bleeding and irritation in the vaginal area and a lack of hymenal tissues. *Id.* When the victim was examined at CARES by Dr. Keltner, she showed signs of having been drugged, as well as signs of acute vaginal trauma. Keltner arranged for tests, including a rape kit test, as well as a urine toxicology screen, and turned over the victim's bloody underwear to the police. *Id.* at 195-96. The toxicology screen showed the presence of morphine, codeine, oxycodone, and acetaminophen. *Id.* at 196. The rape kit did not reveal the presence of sperm, seminal fluid, or pubic hairs. *Id.* The

---

[3] CARES is a medical facility where children are evaluated for sexual abuse. *See State v. Alne*, 219 Or App 583, 184 P3d 1164 (2008).

underwear, however, contained a small number of petitioner's sperm, as well as epithelial cells that were consistent with having come from the victim. *Id.* at 196-97.

Petitioner was charged with the above-noted offenses, and was tried, for the first time, in the spring of 1996. In that trial,

> "[t]he state's theory was straightforward: [Petitioner] had drugged complainant and then raped her. As support for that theory, the state relied substantially, albeit not exclusively, on complainant's, [Carol] Wyatt's, and Keltner's testimony, as well as that of forensic experts, Kevin Humphries of the Oregon State Police Crime Lab, who tested and analyzed the sleeping bag, underpants, and swabs, and Susan Hormann, a specialist in serology and DNA testing at the OSP Crime Lab. Complainant had no memory of a rape and, with a few variations, generally reiterated the account she had given to Keltner and to law enforcement personnel. [Carol] Wyatt testified that she had great difficulty rousing complainant on the morning of the 24th, that complainant had obviously been drugged, and that, when she took off complainant's underwear, she saw blood on the underpants. [Carol] Wyatt also testified that, when she subsequently called [petitioner] and told him that complainant had been drugged and probably raped, he responded, 'You'll never be able to prove that I did it. You won't find any sperm.' "

*Id.* at 197.

Petitioner's theory of defense was that Carol Wyatt, motivated by animosity toward petitioner, had committed the crimes by taking sperm from earlier intercourse between petitioner and Wyatt, planting it in the victim's underwear, and then drugging the victim and sexually assaulting her with a blunt object. *Id.* at 198.

The first trial resulted in a hung jury, and petitioner was tried again several months later. In the second trial, which resulted in petitioner's convictions, the parties again pursued the same theories generally. However, in the second trial, during the state's case-in-chief, the state's DNA expert, Hormann, addressed in detail the defense theory that Carol Wyatt had transferred sperm from intercourse between petitioner and Wyatt into the victim's underpants. In particular,

Hormann opined that the sperm could not have been transferred from Carol Wyatt's vagina to the underpants because the epithelial cells found in the underwear could not have come from her and because, had Carol Wyatt extracted the sperm from her vagina and planted it in the victim's underwear, Hormann would have expected to find some of Wyatt's epithelial cells intermixed with the sperm, which she did not. *Id.* at 198-99.

After Hormann testified, defense counsel indicated to the prosecutor that he might call Grimsbo, a forensic scientist, in response to Hormann's testimony. The prosecutor telephoned defense counsel later that evening to inquire whether Grimsbo would be called, and defense counsel said that he did not think so, but was not certain. Thereafter, defense counsel decided that he would call Grimsbo, and left a message for the prosecutor to that effect, which the prosecutor did not receive until the next day. *Id.* at 199-200.

When trial reconvened the next morning, the prosecutor objected to Grimsbo's testimony on the ground that there had been a discovery violation because Grimsbo had not been declared as a witness in advance. The prosecutor argued that defense counsel had Hormann's report well in advance of trial and should have anticipated his need to call Grimsbo to rebut that testimony. The court agreed with the prosecutor's argument and concluded that Grimsbo's testimony should be excluded due to the discovery violation in light of the "stage of the proceedings." *Id.* at 201. Petitioner's subsequent offer of proof indicated that Grimsbo would have testified that the absence of Carol Wyatt's epithelial cells from the sperm was not unusual, given that the sperm sample was extremely minute (*viz.*, 80 sperm, whereas a normal ejaculation would produce over 300,000 sperm). *Id.* at 200.

The jury, by a 10-2 verdict, convicted petitioner on the counts that are collaterally challenged here. As noted, in *Wyatt I*, we reversed defendant's convictions, concluding that the trial court had erred in precluding Grimsbo's testimony as a discovery sanction and that error was not harmless; and the Supreme Court reinstated the convictions, concluding that trial counsel's failure to timely and specifically object to

the preclusion sanction rendered the asserted error unreviewable. As further noted, the post-conviction court determined that trial counsel had been constitutionally inadequate both in (1) failing to comply with the requirements of the reciprocal discovery statutes, which led to the imposition of the preclusion sanction, and (2) failing to advocate for a less onerous sanction for that violation. The post-conviction court also determined that those defaults were so prejudicial as to warrant the allowance of a new trial.

■     We turn, then, to the state's contentions that the post-conviction court erred in granting relief. The state, as noted, does not dispute that trial counsel failed to exercise reasonable professional skill and judgment, as determined by the post-conviction court. Rather, the state asserts that the court's assessment of consequent prejudice was erroneous in either, or both, of two respects. First, the state argues that petitioner was unable to show prejudice because petitioner did not demonstrate that, even if counsel had made a timely argument for a lesser sanction, the criminal trial court would have admitted the evidence. Second, and alternatively, the state asserts that, even if the criminal trial court had admitted Grimsbo's testimony, it would not have affected the jury's verdict.

The state's first argument is unavailing, because it ignores the post-conviction court's determination that counsel breached the standard of constitutionally adequate representation not only by failing to advocate for a less onerous discovery sanction *but also* by failing to timely disclose Grimsbo as a defense witness pursuant to ORS 135.835 and ORS 135.845. Specifically, the post-conviction court determined that,

"[a]t the time defense counsel failed to act in considering all the circumstances, counsel should have been aware that the testimony of the expert defense witness was essential to an effective defense, *should have disclosed the expert*, and, having failed to disclose the expert, should have objected to the trial court's error in failing to consider and select a less draconian, but still sufficient, sanction for the error of counsel."

(Emphasis added.) But for counsel's actionable default in violating the discovery statutes, there would not have been any occasion for *any* sanction. Whether the trial court would have imposed a "less onerous" sanction than preclusion would be a moot point because *no* sanction would ever have been imposed. Bluntly, but for counsel's default, Grimsbo would have testified.

The issue of actionable prejudice thus reduces to whether the absence, or nonpresentation, of Grimsbo's testimony had the requisite "tendency to affect the result of the prosecution." *Steven*, 322 Or at 110. The state contends, particularly, that petitioner's theory of the case was so "highly unlikely" it would have been "all but impossible" for a jury to credit it, and thus Grimsbo's testimony would not have had a tendency to affect the verdict. That argument warrants more extended discussion.

We note at the outset—as did the trial court—that we have previously, albeit in a collateral context, touched on that question. Specifically, in *Wyatt I*, 155 Or App at 204, in addressing whether the preclusion of Grimsbo's testimony required reversal, we stated:

> "The state asserts, nevertheless, that any error was harmless. The state emphasizes the strength of the prosecution's case and asserts that defendant's 'transferred sperm' scenario was 'fantastic' and depended, ultimately, on defendant's credibility, which the jury necessarily rejected.
>
> "Based on our review of the record, we cannot say that there is little likelihood that Grimsbo's testimony would have affected the verdict. However 'fantastic' the 'transferred sperm' hypothesis might seem, at least to the state, the jury in the first trial could not agree on guilt. In the first trial, the state had not focused on, and exploited, the 'gap' in the 'transferred sperm' theory—the absence of Wyatt's DNA. In the second trial, through Hormann, it did. Grimsbo's testimony, if believed, would have explained that seemingly inexplicable 'gap.' The error was not harmless."

(Citations omitted.)

That discussion, however, is not dispositive here for at least three reasons. First, the Supreme Court, by reversing

our decision in *Wyatt I* on grounds of nonpreservation, rendered our discussion of the effect of the preclusion of Grimsbo's testimony a legal nullity. Second, although there may be substantial overlap between the assessment of "harmlessness" of evidentiary error for purposes of Article VII (Amended), section 3, of the Oregon Constitution and the determination of whether nonpresentation of evidence had the requisite "tendency to effect" for purposes of post-conviction relief, we do not assume that the two are always congruent. *But see Trotter v. Santos*, 212 Or App 473, 478, 157 P3d 1233, *adh'd to on recons*, 214 Or App 696, 167 P3d 488, *rev den*, 343 Or 691 (2007) (relying on "harmless error" cases in concluding that the petitioner was entitled to post-conviction relief). Finally, as the state emphasizes, our discussion in *Wyatt I* was, necessarily, predicated on the content of the criminal trial record—but the state, in the post-conviction relief proceedings, submitted additional evidence describing testimony that the prosecutor would have presented to rebut Grimsbo's testimony if he had, in fact, testified.

We proceed, then, to the evidence in the post-conviction record pertaining to the effect of the preclusion of Grimsbo's testimony. We begin by highlighting some key evidentiary aspects of petitioner's second trial. Petitioner testified that, shortly before he entered the tent with the victim, he and Carol Wyatt had consensual sex without using any form of birth control, and that she was not menstruating. Carol Wyatt, on the other hand, testified that they had not had sex since July 17, and that they did not have sex on July 23 because she began menstruating on July 21. Both testified that, because they used the rhythm method of birth control, Carol Wyatt kept a chart showing when she menstruated and when they had sex. Petitioner maintained, however, that Carol Wyatt's recordkeeping on the chart was not always accurate. The chart supported Carol Wyatt's testimony that she was menstruating on July 23.

As noted, petitioner's theory of defense was that Carol Wyatt had taken secretions from her own vagina after engaging in consensual sex with petitioner, drugged the victim and assaulted her vagina with some sort of blunt object, and then placed the secretions in the victim's underwear.

Anticipating that theory (from the first trial), the state's forensic expert, Hormann, testified in the state's case-in-chief that she discounted petitioner's theory of the case because had the secretions come from Carol Wyatt's vagina, Hormann would have expected to find some of Carol Wyatt's epithelial cells intermixed with the sperm.

Petitioner was prepared to offer Grimsbo's expert testimony to the effect that, because the amount of sperm found in the victim's underwear was so small, it would not be unusual for no epithelial cells from Carol Wyatt to be present even if the secretions had been transferred from her vagina. Thus, Grimsbo's expert opinion would have contradicted Hormann's expert opinion on that point.

That juxtaposition of Hormann's testimony and Grimsbo's putative testimony in the second trial is particularly significant given differences between the state's evidence at the first trial, which resulted in a hung jury, and the second trial. At the time of the first trial, Hormann testified that the underwear contained petitioner's sperm, as well as epithelial cells that were consistent with the victim. She did not analyze whether the epithelial cells were consistent with anyone else. Defense counsel relied heavily on that point in closing argument in the first trial:

"There has been no question in this case about whose sperm this was. Never has been, never will be. That is not the issue. The question is, whose blood did it come in? And why is it that nobody got a sample of Carol Wyatt to eliminate her as a possible person involved in this? * * *

"It is Ralph Wyatt's sperm that was found in there, no question about it. The other question though, was it delivered with some cells from Carol Wyatt, and there is no answer to that question. Why? Because no one bothered to check."

That trial, as noted, ended in a hung jury.

In the second trial, however, the state closed that gap in the prosecution's evidence, which defense counsel had exploited in the first trial. By the time of the second trial, Hormann had tested Carol Wyatt's DNA and was able to state definitively that the epithelial cells that were consistent

with having come from the victim were *not* consistent with having come from Carol Wyatt. Given that testimony, Hormann's testimony at the second trial that it was not likely that Carol Wyatt could have transferred the secretions from her vagina without also transferring her own epithelial cells was extremely damaging to the defense theory of the case.

Grimsbo's putative testimony would have offered at least a partial answer to Hormann's revamped testimony, reinforcing the defense's "transferred sperm" theory. That is, Hormann's testimony that it was "not likely" that Carol Wyatt could have done this without transferring her own epithelial cells would have been contradicted by Grimsbo's testimony that, in his opinion, the absence of Carol Wyatt's epithelial cells from such a small sample would not be unusual.

We note, further, that, even without Grimsbo's evidence to rebut Hormann's testimony, the jury had a difficult time reaching a verdict. When the jury first attempted to return a verdict, it found defendant not guilty on two of the charges, but split 9-3 on the rape and sexual abuse charges, and 8-4 on the delivery of a controlled substance charge. When they returned a valid verdict the following week, the verdict on each count was 10-2. In sum, the case was as close as a case can be and still result in conviction.

The state contends, nevertheless, that evidence it presented at the post-conviction trial as to how Hormann would have rebutted Grimsbo's testimony if he had testified demonstrates that petitioner incurred no prejudice warranting the allowance of a new trial. Specifically, at the post-conviction trial, the state offered an affidavit from Hormann that explained that she would have made use of Carol Wyatt's testimony that she was menstruating at the time of the crime to explain that a post-coital sample of secretions taken from a woman's vagina under such circumstances would consist not only of vaginal secretions and seminal fluid with sperm, but also menstrual blood. She further would have testified that it would be "highly improbable" that a woman could collect a post-coital sample of secretions taken from her vagina without also collecting some of her own epithelial cells.

In short, Hormann would have used Carol Wyatt's evidence about menstruation to try to rebut part of Grimsbo's testimony. However, given that the defense theory of the case was that Carol Wyatt was not credible—and, in fact, committed the crimes herself—Hormann's evidence on that point, which depended on the veracity of Carol Wyatt, was only as strong as Carol Wyatt's evidence.

Hormann's remaining point, that it would be "highly improbable" that a woman could collect vaginal secretions in the manner asserted by the defense, reduces to a classic "battle of the experts." That is, Grimsbo would have testified that the absence of Carol Wyatt's epithelial cells from the sperm was "not unusual" under these circumstances, while Hormann would have testified that it was "highly improbable." Thus, Grimsbo's testimony "would have called into question pivotal testimony" by one of the state's witnesses. *Stevens*, 322 Or at 110.

Given the foregoing, we conclude that the post-conviction court did not err in determining that the exclusion of Grimsbo's testimony had the requisite "tendency to affect the result" of petitioner's second trial. *Id*.

Affirmed.