Argued and submitted July 9, 2012, convictions of burglary reversed and
remanded; otherwise affirmed March 20, 2013

CONAN WAYNE HALE,
*Petitioner-Appellant,*

*v.*

Brian BELLEQUE,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
04C13562; A143075

298 P3d 596

Daniel J. Casey argued the cause and filed the opening and reply briefs for petitioner. Conan Wayne Hale filed the supplemental brief *pro se*.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, Anna M. Joyce, Solicitor General, Pamela J. Walsh, Assistant Attorney General, and Joanna L. Jenkins, Assistant Attorney General.

Before Wollheim, Presiding Judge, and Haselton, Chief Judge, and Nakamoto, Judge.

WOLLHEIM, P. J.

## WOLLHEIM, P. J.

In 1998, petitioner was convicted of 13 counts of aggravated murder and sentenced to death for the murders of three victims committed in 1995. Defendant was also convicted of a number of other offenses, including burglary, theft, criminal mischief, kidnapping, rape, sodomy, unlawful sexual penetration, and sexual abuse. On direct review, the Supreme Court reversed six of the 13 aggravated murder convictions and affirmed seven of the convictions and the death sentences and remanded for resentencing. The court remanded the seven affirmed convictions for entry of corrected judgments reflecting three convictions for aggravated murder and imposing a single sentence of death for each conviction. *State v. Hale*, 335 Or 612, 75 P3d 612 (2003), *cert den*, 541 US 942 (2004). In this post-conviction proceeding, petitioner sought to have the remaining seven convictions for aggravated murder and his other convictions set aside due to constitutionally inadequate and ineffective assistance of counsel during the guilt and penalty phases of his trial and on appeal, and he also raised independent constitutional arguments challenging the death sentences. The post-conviction trial court rejected petitioner's post-conviction claims. For the reasons explained herein, we reverse and remand two burglary convictions and otherwise affirm.

## I. THE UNDERLYING CRIMES

We begin with the facts of the underlying crimes, as described by the Supreme Court on direct review:

"In late 1995, defendant, then 19, and his friend, Jon Susbauer, then in his early twenties, began committing a series of burglaries and robberies in the Eugene area. As pertinent here, on December 14, 1995, defendant and Susbauer broke into a woman's home, stole several thousand dollars worth of her property, and slashed a couch and a stereo speaker with a knife before leaving.

"At around midnight on December 16, 1995, defendant and Susbauer drove up beside a car parked on an isolated road in a remote wooded area in Eugene. The men were in a silver Chevrolet Suburban that Susbauer had stolen a few weeks earlier. Two teenagers, Kara Krause and Jesse Jarvis, were in the parked car. The person on the passenger

side of the Suburban got out, approached the parked car, and knocked on the window. He told the couple that they were on his property but that they could stay. He then returned to the Suburban and Jarvis heard laughter. The Suburban drove off.

"A few minutes later, Jarvis heard a man yelling. Jarvis got out of the parked car to investigate and, he later testified, a man 'jumped out of nowhere.' The man was large and stocky. He was dressed in dark clothing and wore a long coat. His head and face were covered with some kind of mask or scarf; only his eyes were visible. He carried something that looked like a machete and was swinging it like a sword. He spoke in a low rough growl and threatened Jarvis with the machete. He ordered Krause out of the car and told them both to take off their clothes and shoes. When they had complied, the man threw the couple's car keys, clothes, and shoes into the woods. The man forced Jarvis to lie on the ground and Krause to lie across the hood of the car. He threatened Krause with the blade of the machete and sexually assaulted her.

"Jarvis later told police that he thought that the person who claimed to be the 'property owner' and the rapist were different people. Weeks later, at two police lineups, Jarvis identified Susbauer as the 'property owner' and defendant possibly as the rapist. Krause was not able to identify the rapist when shown the same lineups.

"On December 19, 1995, defendant and Susbauer broke into another house and again stole thousands of dollars worth of property including, among other things, a rabbit-fur jacket, a .38 caliber Taurus revolver with wooden grips, and 25 rounds of ammunition for the revolver. Before they left, they again slashed the furniture with a knife.

"Late in the evening on December 20, defendant and Susbauer were riding around in the stolen Suburban. Susbauer was driving. They saw defendant's former girlfriend, Kristal Bendele, 15, her current boyfriend, Brandon Williams, 15, and two other young people, Patrick Finley, 13, and Michael Black, 15. Defendant and Susbauer drove toward them and parked the Suburban. Defendant got out of the Suburban. He was wearing a black trench coat and jeans. Defendant offered the teenagers a ride, which Bendele, Williams and Finley accepted. Black declined. As

Black walked away, he saw the Suburban slowly drive off in a different direction.

"The next afternoon, December 21, 1995, two men found the nude bodies of Williams and Bendele at a logging landing on McGowan Creek. Bendele had been shot twice, once in the back and once in the left temple. Williams had been shot five times; three shots were to the head and face, one to the chest, and one to the back. Finley, barely alive, also was lying nearby. He, too, had been shot twice, once in the head and once in the shoulder. Among other things, he was wearing the rabbit-fur jacket that defendant and Susbauer had stolen in the earlier burglary. Finley died four days later without ever regaining consciousness.

"Police visited Susbauer at his home on December 24, 1995, and seized the .38 caliber Taurus revolver stolen during the December 19 burglary. On December 26, police searched defendant's bedroom. There, they seized a black trench coat and a machete.

"The Taurus revolver later was proved to be the murder weapon; all the bullets recovered at the scene and from the bodies of the victims had been fired from that gun. Testing of the grip of the revolver revealed a mixture of DNA patterns, the most predominant of which matched that of Bendele. Semen obtained from Bendele's mouth, vagina, and anus was identified as Susbauer's. Semen on Bendele's shirt and on the rabbit-fur jacket that Finley was wearing was identified as defendant's.

"Defendant and Susbauer both were charged with aggravated murder and various other crimes in the murders of Bendele, Williams, and Finley, in the assault on Jarvis and Krause, and in the December 14 and December 19 burglaries. Susbauer agreed to cooperate and pleaded guilty to, among other things, three counts of aggravated murder. Thereafter, the district attorney decided to seek the death penalty only against defendant.

"At the ensuing trial, defendant's theory was that Susbauer was the rapist and killer and that he, defendant, merely was in the wrong place at the wrong time. Susbauer's story was the opposite: Defendant was the director of the abuse and murderer of all the victims; Susbauer was a secondary—and, in part, unwilling—accomplice. The jury rejected defendant's theory and convicted him of 13 counts of aggravated murder and multiple noncapital crimes

arising out of the burglaries and the attack on Krause and Jarvis.

"Defendant was sentenced on the noncapital crimes at the conclusion of the guilt-phase trial. The trial court then conducted a penalty-phase trial on the aggravated murder convictions. In that proceeding, the jury determined that defendant had acted deliberately in committing the murders, that he posed a continuing risk to society, and that he should receive a death sentence. The trial judge then entered a sentence of death."

*Hale*, 335 Or at 614-17 (footnote omitted).

## II. THE POST-CONVICTION CASE AND APPLICABLE LAW

Petitioner's petition for post-conviction relief alleged 17 claims, and included claims of inadequacy of trial counsel during both the guilt and penalty phases of trial[1] and inadequacy of appellate counsel. Petitioner also raised several stand-alone claims challenging the constitutionality and imposition of the death penalty.

A petitioner is entitled to raise on post-conviction relief only those issues that he could not reasonably have raised on direct appeal. *See* ORS 138.550(2) (post-conviction relief available only if ground for relief "was not asserted and could not reasonably have been asserted in the direct appellate review proceeding"); *Palmer v. State of Oregon*, 318 Or 352, 354, 867 P2d 1368 (1994) (holding that a post-conviction petitioner may not assert, as a ground for relief, any issue "that was not raised at trial in the underlying criminal proceeding, when the petitioner reasonably could have been expected to raise that issue in the trial court and when the petitioner does not assert the failure to raise that issue constituted inadequate assistance of trial counsel."). *Palmer* identifies a number of examples: A post-conviction court can consider arguments not made at trial where counsel was incompetent or guilty of bad faith, where the right subsequently sought to be asserted was not generally recognized to be in existence at the time of trial; where counsel

---

[1] As is typical in capital aggravated murder cases, petitioner was represented at trial by two attorneys. For ease of reading we will refer to both attorneys as counsel.

was excusably unaware of facts which would have disclosed a basis for the assertion of the right; and where duress or coercion prevented assertion of the right. 318 Or at 357-58.

To prevail on his claims regarding the effectiveness of counsel under Article I, section 11, of the Oregon Constitution, petitioner was required to prove, by a preponderance of the evidence, facts demonstrating that trial or appellate counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). To prevail on his claims under the United States Constitution, petitioner was required to prove that trial counsel's performance "fell below an objective standard of reasonableness *** under prevailing professional norms" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984).[2]

The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances; the post-conviction court's standard of review is a highly deferential one. *Kimmelman v. Morrison*, 477 US 365, 381, 106 S Ct 2574, 91 L Ed 2d 305 (1986). That is, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 US at 689. Whether counsel rendered deficient performance is a question of law. *Simpson v. Coursey*, 224 Or App 145, 153-54, 197 P3d 68 (2008), *rev den*, 346 Or 184 (2009). In reviewing a post-conviction claim of ineffective assistance of counsel, the court "will not second-guess a lawyer's tactical decisions unless those decisions reflect an absence or suspension of professional skill and judgment[.]" *Cunningham v. Thompson*, 186 Or App 221, 226, 62 P3d 823 (2003), *adh'd to as modified*, 188 Or App 289, 71 P3d 110 (2003), *rev den*, 337 Or 327 (2004)

---

[2] The standards for determining the adequacy of counsel's representation are functionally equivalent under the state and federal constitutions. *State v. Davis*, 345 Or 551, 579, 201 P3d 185 (2008).

(citing *Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981)).

Even if a petitioner is successful in showing that counsel was ineffective, the post-conviction court may not grant relief in the absence of a showing of prejudice. Prejudice of state constitutional magnitude is established by showing that "counsel's advice, acts, or omissions had 'a tendency to affect the result of the prosecution.'" *Ashley v. Hoyt*, 139 Or App 385, 392, 912 P2d 393 (1996) (quoting *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995)). Under the United States Constitution, prejudice is established by showing that there is reasonable probability that but for counsel's deficient performance the result would have been different. *Strickland*, 466 US at 694. The existence of prejudice is a question of law that may be dependent on predicate facts. *Ashley*, 139 Or App at 395 n 8.

The allegations of the petition frame the issues that a post-conviction court can consider, and a petitioner who fails to raise a claim in a petition for post-conviction relief has waived it and is foreclosed from making arguments on claims not raised in the petition, *Bowen v. Johnson*, 166 Or App 89, 92, 999 P2d 1159, *rev den*, 330 Or 553 (2000), or that expand on the claims pleaded. *Leyva-Grave-De-Peralta v. Blackletter*, 232 Or App 441, 448-53, 223 P3d 411 (2009), *rev den*, 348 Or 114 (2010). Preservation principles apply in the context of post-conviction relief and, as a general rule, arguments not made to the post-conviction court in support of a claim will not be considered on appeal. *Haney v. Schiedler*, 202 Or App 51, 55, 120 P3d 1225 (2005); *Taylor v. Hill*, 202 Or App 29, 32-33, 120 P3d 1248 (2005).

The appellate court reviews the post-conviction court's legal conclusions for errors of law, *Monahan v. Belleque*, 234 Or App 93, 95, 227 P3d 777, *rev den*, 348 Or 669 (2010), and is bound by the post-conviction court's findings of fact, if they are supported by any evidence in the record. *Wyatt v. Czerniak*, 223 Or App 307, 311, 195 P3d 912 (2008). The appellate court does not reweigh the evidence—it simply determines whether any evidence in the record supports the findings made by the trial court. *Pratt v. Armenakis*, 201 Or

App 217, 220, 118 P3d 821 (2005), *rev den*, 340 Or 483 (2006). The existence of evidence in the record that contradicts the post-conviction court's findings is not the determinative issue on appeal. The determinative issue on appeal of a judgment dismissing a petition for post-conviction relief is whether there is any evidence in the record that supports the post-conviction court's findings. *Kinkel v. Lawhead*, 240 Or App 403, 413, 246 P3d 746, *rev den*, 350 Or 408 (2011). If the post-conviction court did not make findings, and there is evidence from which the facts could be decided more than one way, the appellate court will presume that the post-conviction court made factual determinations consistent with the court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

In a 35-page opinion, the post-conviction court considered each of petitioner's claims and denied relief, making extensive findings of fact and conclusions of law that we discuss in more detail below.

### III.   CLAIMS ADDRESSED ON APPEAL

In his opening brief, petitioner asserts 16 assignments of error, and, in his supplemental *pro se* brief, he asserts three additional assignments. We address each assignment in the context of the post-conviction claims to which it pertains.

A.   *First assignment of error—mental illness claims*

As relevant to the first assignment of error, in the first claim of his post-conviction petition, petitioner asserted that imposition of the death penalty deprives him of the protections of Article I, sections 11, 13, 15, 16, and 20 of the Oregon Constitution and the protections of the Eighth and Fourteenth Amendments to the United States Constitution, as well as fundamental fairness, due process, and equal protection. Specifically, petitioner asserted that he is of low intelligence and may have a mental illness, and that it is cruel and unusual to put to death a person who is so afflicted.

Additionally, in his seventh claim for post-conviction relief,[3] petitioner asserted that trial counsel provided inadequate and ineffective assistance by failing to provide McDonald, the evaluating psychologist, with a complete psychological history of petitioner, thereby limiting the reliability of his evaluation, and by failing "to secure a medical evaluation of the Petitioner by a psychiatrist to determine whether the Petitioner had an organic brain defect or medical/psychiatric condition, such as Attention Deficit Disorder, Fetal Alcohol Syndrome or schizophrenia."

We summarize the post-conviction court's findings as pertinent to the first assignment:

1. Within a month of petitioner's arrest, petitioner's defense counsel hired McDonald, a licensed psychologist, who was directed to conduct an exhaustive psychological examination, and extensive psychological and cognitive testing of petitioner in an effort to identify any condition that could assist in defense or mitigation efforts.

2. Petitioner's trial counsel made a reasonable tactical and strategic choice not to give petitioner's juvenile records to McDonald so that those reports would not be discoverable by the state if McDonald testified. The records were particularly prejudicial to petitioner because they portrayed him as an extremely violent and aggressive person who was very manipulative and who refused to submit to authority or take direction from anyone. That information directly contradicted the defense theory that petitioner was merely a follower of his co-defendant, Susbauer. The records also contained specific information that tended to identify petitioner as an active participant, if not leader, in the crimes, including comments about killing people, reference to Satan, his habit of returning ID to his victims, as occurred in this case, and his sudden, brutal attack on a friend.

3. Although defense counsel did not turn over the records themselves, they did tell McDonald what the records contained, and McDonald was aware of the substance of mental health evaluations during which petitioner claimed to be experiencing psychotic symptoms. Petitioner's trial counsel specifically advised McDonald that he needed to

---

[3] Most of petitioner's claims of inadequacy of counsel were alleged in his seventh claim for post-conviction relief, so there will be many references to that claim throughout this opinion.

rule out schizophrenia and told McDonald that petitioner's father might be mentally ill. Trial counsel also raised with McDonald the issue of whether petitioner might have multiple personalities.

4. McDonald met with petitioner approximately 30 times over the period of more than a year. McDonald conducted cognitive testing of petitioner and ruled out the presence of any organic brain defect. During his meetings with McDonald, petitioner disclaimed any symptoms of mental illness and denied that mental illness played any role in his crimes. Petitioner never told trial counsel that mental illness played a role in his commission of the crimes. Petitioner admitted to McDonald that his previous reports to counselors and mental health professionals of psychotic symptoms were false. Based on an exhaustive investigation and evaluation lasting over one year, McDonald concluded that petitioner did not have a mental illness. McDonald diagnosed petitioner with antisocial personality disorder and psychopathy. McDonald's conclusions are reliable.

5. Petitioner did not prove that the results of McDonald's evaluation would have been different if his trial counsel had given McDonald actual paper copies of the treatment records, instead of telling him what the records contained.

6. Petitioner did not prove that he is mentally retarded or of low intelligence; his intellectual abilities fall within the average range.

7. Petitioner did not prove that he suffers from fetal alcohol syndrome.

8. Petitioner did not prove that he meets the diagnostic criteria for schizophrenia or that he was suffering from a mental illness at the time he committed the crimes or during his trial, that he currently suffers from a mental illness, or that he will suffer from a mental illness in the future. His primary diagnosis is severe antisocial personality disorder and a very high degree of psychopathy.

9. The report of the state's psychologist, Dr. Colistro, is reliable and persuasive. The report of petitioner's expert, Dr. Larsen, who diagnosed petitioner with schizophrenia, is not reliable or persuasive, because it is based on incomplete and unreliable information.

10.   Petitioner is not credible and his evidence to support his claim of mental illness is not reliable or credible and conflicts with the vast weight of the evidence. Petitioner's self-reports of his current mental condition lack credibility. Petitioner told people that his strategy for post-conviction relief was to rely on a claim of mental illness built upon the juvenile reports that he had previously admitted were false.

11.   Petitioner did not prove that a psychologist is not qualified to diagnose schizophrenia or that his trial counsel's choice of an expert was unreasonable or that adequate representation necessitated evaluation by a psychiatrist rather than a psychologist.

12.   After a thorough investigation, petitioner's trial counsel made a tactical choice not to raise an insanity defense or attempt to pursue a mental illness claim in mitigation. Trial counsel's tactical decision was reasonable, given the lack of evidence in support of a claim of mental illness and the risk of opening the door to extremely damaging information about petitioner and his violent past.

Petitioner's first assignment encompasses petitioner's multiple assertions regarding mental illness. Petitioner asserts that the post-conviction court erred in rejecting his claims that trial counsel rendered inadequate and ineffective assistance (1) by failing to have petitioner examined by a psychiatrist (as opposed to a psychologist), who would have treated petitioner with antipsychotic drugs and diagnosed schizophrenia, and (2) by withholding from McDonald, the psychologist who examined petitioner, information in petitioner's juvenile files that might have supported a diagnosis of schizophrenia. Petitioner asserts further that the record does not support the post-conviction court's finding that he does not suffer from schizophrenia, because the finding is based on a flawed analysis by the state's psychologist and the defense psychologist, who lacked petitioner's juvenile records.

Also within his first assignment, petitioner contends that the post-conviction court erred in rejecting his claim that, because petitioner suffers from schizophrenia, imposing the death penalty would violate the Eight Amendment's prohibition against cruel and unusual punishment under

the rationale of *Atkins v. Virginia*, 536 US 304, 122 S Ct 2242, 153 L Ed 335 (2002), a case decided after petitioner's conviction and sentence in this case.

Finally, within his first assignment of error, petitioner contends that the post-conviction court erred in rejecting his claim that trial counsel provided inadequate and ineffective assistance in failing to further investigate and develop the issue of whether defendant suffers from fetal alcohol syndrome.

The evidence in the post-conviction trial record supports all of the post-conviction court's findings rejecting petitioner's mental illness claims. The record supports the post-conviction court's finding that a psychiatrist would not have been more qualified than McDonald, a psychologist, to diagnose schizophrenia, and it further supports the post-conviction court's findings that petitioner does not suffer from schizophrenia or a mental illness. The trial court further found that petitioner does not suffer from fetal alcohol syndrome, and that finding is also supported by the evidence.

The evidence further supports the post-conviction court's findings that defense counsel made tactical decisions not to raise petitioner's mental health, either as a defense or in mitigation, and not to provide paper copies of petitioner's juvenile records to McDonald, so as to prevent them from being discoverable by the prosecution, due to the extremely prejudicial nature of some of the information contained in them. We agree with the post-conviction court's conclusion that trial counsel's tactical decisions were objectively reasonable, given the record in support of the finding that petitioner does not suffer from mental illness, petitioner's admission to falsely reporting psychotic symptoms, and petitioner's general lack of credibility.

We conclude for all of those reasons that trial counsel was not ineffective in the manner asserted in the first assignment of error.

However, even if trial counsel had provided ineffective representation, we conclude that petitioner did not establish prejudice. Even assuming that trial counsel was

ineffective in not providing McDonald with copies of petitioner's juvenile records, we conclude that petitioner has failed to establish that the failure to provide those records to McDonald—as distinct from trial counsel's oral description of their contents—had a tendency to affect the result of the prosecution and punishment. *Stevens*, 322 Or at 110. And, even if trial counsel was ineffective in not further investigating the possibility that petitioner had an organic brain defect or a medical or psychiatric condition by having petitioner examined by a psychiatrist, in light of the post-conviction court's findings, which are supported by the evidence in the record, that petitioner does not suffer from such conditions, petitioner has not shown prejudice.

In light of the above conclusions, we reject petitioner's Eighth Amendment challenge, as framed in this assignment of error, which is premised on petitioner's assertion that he suffers from mental illness. Additionally, the claim as alleged is not a claim of inadequate assistance of counsel and is barred by *Palmer*.

B. *Second assignment of error—use of physical restraints*

The arguments in petitioner's second assignment of error address the post-conviction court's denial of his claims relating to the criminal trial court's orders that petitioner wear physical restraints—including leg cuffs (shackling), leg braces, and handcuffs—for transportation to and from the court room and during the guilt and penalty phases of trial. In his fourth post-conviction claim, petitioner asserted that he is entitled to relief because, before ordering him to wear restraints, the trial court failed to make the requisite findings on the record that he was a security or flight risk. That failure, petitioner contended, deprived him of constitutional rights to a fair trial, to unfettered consultation with counsel, and to have his guilt or innocence determined solely on the basis of the evidence.[4] In his seventh claim for relief,

---

[4] Petitioner's fourth claim for post-conviction relief alleged that the trial court violated petitioner's constitutional rights when, *without appropriate objection from defense counsel*, the court ordered that petitioner be shackled during the penalty phase of trial. Unlike the state, we do not treat that allegation as one of inadequacy of counsel, as it clearly relates to a ruling of the court. *See Leyva-Grave-De-Peralta*, 232 Or App at 448-53 (declining to expand on the claims pleaded).

petitioner contended that counsel was inadequate in failing to make a continuing objection to (1) petitioner wearing shackles as he was led past the jury room and (2) remaining in physical restraints throughout the guilt and penalty phases of trial, when there was no evidence that petitioner was a security risk.

We summarize the post-conviction court's findings with respect to the physical restraint issues raised in the fourth and seventh claims for post-conviction relief:

1.   The trial court heard testimony at a pretrial hearing about petitioner's history of violence and his unpredictable conduct. Before the verdict in the guilt phase of trial, the trial court ordered that petitioner wear a leg brace and handcuffs during transportation to and from the courtroom. The handcuffs were removed before the jury entered the court room. The only restraint that petitioner wore during the guilt phase of trial was a leg brace that was concealed under his pants and was not visible to the jury. The trial court also ordered that skirting be affixed to the table at which petitioner was sitting so that the jury could not see the leg restraints.

2.   After the verdict in the guilt phase of trial, the trial court ordered that petitioner also wear shackles during transportation to and from the courtroom. The shackles were removed before the jury came into the court room.

3.   Petitioner did not prove that any juror who participated in the guilt or penalty phases of trial saw him in leg restraints. Petitioner's testimony that unnamed jurors saw him in shackles during transport was not credible. Petitioner's assertion that he told trial counsel that jurors may have heard his leg restraints during trial also was not credible. Trial counsel did not hear any noise coming from the leg restraints, and if counsel had been aware of any noises that might have affected petitioner's trial, counsel would have raised the issue with the court. Neither the prosecutor nor the jail deputies who transported petitioner and sat near him at trial heard noises coming from the restraints he wore at trial. The leg restraints were not visible to the jury and did not interfere with petitioner's ability to consult with counsel.

4.   Petitioner's trial counsel had no reason to object to the restraints on the basis that they interfered with

petitioner's ability to participate and assist at trial. Petitioner's decision not to testify at trial was a decision made for a variety of reasons not related to restraints.

5. Petitioner's trial counsel reasonably did not object to the trial court's order that petitioner wear leg restraints and handcuffs during transport and that he wear leg restraints during the guilt phase of trial.

The post-conviction court held that petitioner's stand-alone constitutional claims relating to physical restraints were based on facts and issues that were known by peti-tioner or that were reasonably available to him at the time of trial and that they are therefore barred by ORS 138.550(2) and *Palmer*. We agree. The independent physical restraint claims are not based on ineffective assistance of counsel but on the assertion that the criminal trial court erred in ordering the use of physical restraints during trial in the absence of explicit findings on the record that petitioner was a flight or security risk.[5] *See State v. Bates*, 203 Or App 245, 249-50, 125 P3d 42 (2005), *rev den*, 340 Or 483 (2006) (although the trial court has discretion to control a dangerous or disruptive defendant, it abuses that discretion by allowing the accused to be visibly shackled absent a finding that he poses and immediate or serious risk of dangerous or disruptive behavior). Petitioner asserts that the claims could not reasonably have been raised on direct

_____

[5] The fourth claim for relief alleged in its entirety:

"The Petitioner was deprived of the right to a fair trial, the unfettered right to consult with counsel and the right to decide whether to testify without worrying about the impression shackles would create on the jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, thereby depriving the accused the right to have his guilt or innocence determined solely on the basis of evidence, not on grounds [or] circumstances not adduced as proof as trial. Such shackling also deprives the Petitioner of the right to a fair trial under Article 1, section 10 of the Oregon Constitution. No findings were made that the Petitioner was a security or flight risk and no precautions were taken, aside from a cloth in front of the table, to ensure that the jury did not otherwise see or hear the shackles.

"In addition, the trial court violated the above constitutional rights when it ordered, on its own motion, and without appropriate objection from defense counsel, that the Defendant [*sic*] should be shackled and placed in additional restraint, *i.e.*, leg irons, during the penalty phase in contravention of established law at the time of the penalty phase as expressed by *Duckett v. Godinz / McKay*, 67 F3d 734 (9th Cir 1995)."

review, because they depend on evidence outside the criminal trial record that did not come to light until the post-conviction trial, including post-conviction depositions of petitioner, trial counsel, and the prosecutor, and the affidavits of two law enforcement officers who transported petitioner. We reject that argument. Although the specific evidence cited by petitioner could not come into existence until after trial, petitioner knew he was wearing restraints during transport and at trial and reasonably could have objected during trial or on appeal if he believed that the restraints had an effect on the fairness of the trial. The post-conviction court correctly ruled that the stand-alone constitutional assertions relating to physical restraints are barred by ORS 138.550 and *Palmer*.

As noted, the post-conviction court found that the only restraints worn by petitioner at trial—leg braces under petitioner's pants—were not visible to or seen or heard by the jury and did not affect plaintiff's participation in the trial, including plaintiff's decision not to testify. Those findings are supported by evidence in the record. Accordingly, even if we were to reach petitioner's stand-alone assertion and conclude that the trial court erred in not making explicit findings that petitioner was a flight or security risk, we would conclude that petitioner suffered no prejudice.

Petitioner's ineffective assistance of counsel claim related to physical restraints asserted that counsel was ineffective in allowing, "without continuing objections, the Petitioner to be walked by the jury room in shackles and to remain in shackles throughout the guilt and penalty phases when there was no evidence or finding that the Petitioner was a security risk[.]" Petitioner asserts on appeal that neither the record nor the law supports the post-conviction court's rejection of that claim. In his view, in the absence of findings by the trial court that petitioner needed to be physically restrained for security reasons, the failure to object to physical restraints is *prima facie* case of inadequate assistance of counsel and prejudicial. *See State v. Wall*, 252 Or App 435, 287 P3d 1250 (2012), *rev den*, 353 Or 280 (2013) (a trial judge has discretion to order shackling of a defendant

if there is evidence of an immediate and serious risk of dangerous or disruptive behavior); *Davis v. Armenakis*, 151 Or App 66, 72, 948 P3d 327 (1997), *rev den*, 327 Or 83 (1998) (petitioner established, *prima facie*, that he had been denied adequate assistance of counsel by proving that he was shackled in the presence of the jury without a proper record having been made). The state, for its part, contends that, to the extent that *Davis* creates a presumption of inadequacy of counsel for failing to object to physical restraints, that case is inconsistent with controlling precedent, was wrongly decided and should be overruled. The state contends in any event that the record supports the criminal trial court's decision to require the physical restraints.

Because we agree with the state's second contention, we need not address whether *Davis* establishes an incorrect standard. Although, as noted, the trial court made no express findings that petitioner was a flight or security risk, as found by the post-conviction court, the criminal trial record supported the criminal trial court's decision to order the restraint of petitioner during transport and at trial. *See Cunningham*, 186 Or App at 243-44 (although no hearing was held, criminal trial court record supported decision to use restraints). The criminal trial court heard testimony during a pretrial hearing that petitioner could not control his temper, had engaged in violent attacks, had threatened to kill several people, and had walked away from a treatment facility while undergoing treatment. Thus, unlike in *Davis*, 151 Or App at 69-70, the record at petitioner's criminal trial demonstrated that petitioner needed to be physically restrained for security and flight reasons. The shackles and wrist restraints that petitioner wore during transport were removed before the jury was admitted to the court room, and the post-conviction court found that the leg braces worn at trial were not visible under petitioner's pants or through the skirting placed around the table. We agree with the post-conviction court's conclusion that petitioner's trial counsel did not fail to exercise reasonable skill and judgment by not objecting to the trial court's order that petitioner wear leg restraints and handcuffs during transport and leg restraints during trial, or if there was any inadequacy, it was not prejudicial.

## C. *Third assignment of error—advice not to testify*

In his third assignment, petitioner contends that the post-conviction court erred in denying petitioner's ninth claim for post-conviction relief, in which he asserted that he was deprived of the right to testify as a result of "defense counsel's reputed advice that his emotional state made it too risky and by the court's lack of inquiry as to whether his waiver of this right was knowing, intelligent and voluntary." In rejecting petitioner's claim, the post-conviction court found that (1) petitioner's trial counsel did not prevent petitioner from testifying, (2) counsel fully informed petitioner that he had to decide for himself whether to testify, and (3) petitioner made the decision himself not to testify at trial. The post-conviction court further found that trial counsel reasonably advised petitioner not to testify, because counsel had observed petitioner's angry, aggressive behavior, and feared that he would display that behavior to the jury and, further, that counsel had legitimate concerns that petitioner would request the death penalty.

If and to the extent that the ninth post-conviction claim is understood to allege that trial counsel unreasonably advised petitioner not to testify and thereby deprived petitioner of his right to testify, that allegation was rejected by the post-conviction court, and we conclude that the evidence in the record supports the post-conviction court's findings as well as its conclusion that counsel's advice was not unreasonable.

## D. *Fourth assignment of error—failure to raise due process challenge to indictment*

In his fourth assignment of error, petitioner contends that trial counsel was inadequate and ineffective in failing to challenge the indictment on due process grounds, as having been obtained through perjured grand-jury testimony. This assertion was raised, in part, in petitioner's seventh claim for relief, in which he alleged that the state had admitted that a witness who testified before the grand jury, codefendant Susbauer, was unreliable and inconsistent. We summarize the post-conviction court's findings in rejecting that claim:

1.   Petitioner's counsel did not fail to challenge the indictment on the ground that it had been obtained through the presentation of false evidence to the grand jury. Trial counsel raised the issue twice: in a pretrial hearing and during trial. The court rejected defense counsel's assertion, ruling that the state had not acted improperly in seeking the indictment. Trial counsel tried to show at trial that Susbauer's testimony to the grand jury was false, but the evidence did not support that position.

2.   Petitioner failed to prove that the trial court's rulings rejecting trial counsels' assertions were attributable to a failure or deficiency on the part of trial counsel.

On appeal, petitioner asserts that, despite the post-conviction court's findings, the record contains evidence that Susbauer lied to the grand jury and, for that reason, the indictment was materially defective in violation of due process; accordingly, trial counsel's failure to make a due process challenge amounted to inadequate assistance. Petitioner further contends that the record does not support the post-conviction court's findings that trial counsel raised a due process challenge to the indictment as based on perjured testimony.[6]

The state responds that, on the merits of petitioner's contention, he has not proven his claim: As the post-conviction court found, there is no evidence that Susbauer,

---

[6] Rather, petitioner contends, trial counsel asserted that the state's disparate treatment of petitioner and Susbauer in plea negotiations had violated the equal privileges and immunities clause in Article I, section 20, of the Oregon Constitution. Petitioner asserts that the only reference that trial counsel made to Susbauer's grand jury testimony was as an example of evidence of the state's improper motive for treating petitioner and Susbauer differently and as a basis for allowing petitioner to conduct further investigation of that issue. When asked by the trial court to explain how that further investigation would further petitioner's disparate treatment claim, trial counsel responded that, "if [the state is] presenting Susbauer's testimony and he's not being truthful, then that would indicate that [the state was] fairly desperate to convict [petitioner] in acting out of some type of improper motive." The trial court allowed trial counsel to examine two prosecutors and codefendant Susbauer's counsel under oath, but then rejected trial counsel's state constitutional claim, ruling that there had been no showing that the state had an improper motive in the way it treated the two defendants or in indicting petitioner:

"I find that the State has acted properly in obtaining this indictment, that there are no improper motives that have been a part of it, and that the fact that an indictment seeks aggravated murder and a death penalty as a consequence upon conviction does not in any way result from a denial of due process or equal protection."

in fact, lied to the grand jury, and there was no evidence of perjury. In the absence of perjured testimony, the state asserts, it cannot be inadequate assistance to fail to move against an indictment based on it having been obtained through perjured testimony. The state acknowledges that there is evidence in the record that Susbauer lied to police early in the investigation, attempting to minimize his role. The state points out, however, that after the evidence came to light, Susbauer admitted greater involvement, to the extent that the detectives determined that Susbauer was "being truthful in the end." The state asserts that the record shows that trial counsel inquired into that sequence of events and elicited testimony from witnesses concerning their belief that, by the time he testified to the grand jury, Susbauer was being truthful.

We agree with the state that the post-conviction court's finding that petitioner has failed to show that Susbauer lied to the grand jury is supported by evidence in the record. We therefore affirm the post-conviction court's conclusion that trial counsel was not inadequate in failing to move against the indictment on that ground.

E. *Fifth assignment of error—various asserted trial errors*

In his fifth assignment of error, petitioner asserts that the post-conviction court erred in denying post-conviction claims asserting various errors in petitioner's criminal trial. We consider each issue in turn. In his seventh post-conviction claim for relief, petitioner alleged that trial counsel was inadequate in failing to move to strike the testimony of two state witnesses who did not have personal knowledge of the events pertaining to the actual murders but who had knowledge of petitioner having threatened the victims in the past. Trial counsel did not object and elicited testimony from those witnesses that they were openly hostile to petitioner, believed he was guilty, and thought he deserved to die. The post-conviction court rejected the claim of inadequacy, finding that

"[p]etitioner did not prove that his trial counsel provided inadequate assistance or that they did not make a legitimate tactical choice in permitting various state witnesses to

> acknowledge their antipathy towards petitioner in order to demonstrate their bias, so that they could then be impeached with that bias. Petitioner did not prove that he suffered prejudice as a result of his counsel's performance with respect to the handling of any witness."

Petitioner acknowledges that there is evidence that trial counsel tactically relied on the evidence to show the witnesses' bias, but asserts that that tactical decision was not objectively reasonable in view of the highly inflammatory nature of the testimony. In any event, petitioner points out, trial counsel did not argue to the jury that those witnesses were biased or that they should be disbelieved because of bias. As such, petitioner contends, the jury was left with the impression that trial counsel agreed with the witnesses' testimony.

The state responds that, although trial counsel made no argument to the jury regarding the witnesses' bias, on cross-examination trial counsel did, in fact, impeach both witnesses for bias, based on their strongly negative statements regarding petitioner and the fact that they had formed those opinions, in part, based on inaccurate information.[7] The post-conviction court's finding that trial counsel made a tactical decision not to object to the testimony is supported by the evidence. In light of the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, we decline to hold that counsel's tactical decision was constitutionally deficient. *Cunningham*, 186 Or App at 226 (reviewing court will not

---

[7] Tracy, petitioner's former girlfriend, testified that there was no doubt in her mind that petitioner was guilty and that he was involved in and participated in the murders. She said that his crime was "sickening" and "wrong" and that she wanted to see him found guilty. Tracy acknowledged that she had formed her opinion based primarily on highly publicized reports that petitioner had confessed to the murders in a recorded conversation with a Catholic priest, and that, having formed that opinion, Tracy was going to stick with it. In fact, petitioner and the state had stipulated that petitioner had not confessed to the crimes in his conversations with the priest. Thus, trial counsel attempted to demonstrate that Tracy had formed her opinion of petitioner's guilt based on inaccurate information.

Freeman testified that both she and Tracy "wish that this stupid butt would be dead" and that "he deserves to die" and that "he had no right to kill" the victim Bendele. Trial counsel established that Freeman's views might have been influenced by Tracy and was thus also based on inaccurate information.

second guess counsel's tactical decisions unless those decisions "reflect an absence or suspension of professional skill and judgment"). However, assuming that trial counsel's decision constituted ineffective assistance, we conclude that the post-conviction court did not err in concluding that petitioner suffered no prejudice as a result of the testimony.

We move on to petitioner's seventh post-conviction claim. Before his trial for aggravated murder, petitioner had been tried and acquitted of armed robbery in Marion County, based on events in Salem earlier in the evening on the night of the murders. Susbauer pleaded guilty to the robbery as an accomplice and testified at petitioner's armed robbery trial that petitioner had acted as the gunman. The victim also identified petitioner as the man who had threatened her with a gun and robbed her. Petitioner testified in his own defense and blamed Susbauer, and the jury acquitted him.

During opening statements at the aggravated murder trial, the prosecutor explained that the jury would hear evidence that Susbauer and petitioner had been on a crime spree together in the days leading up to the murders and that, although the state and defense disagreed as to whether petitioner or Susbauer had been the gunman in the armed robbery, "[i]t really is not that important or central to this case, except that these two guys are very tight in everything." At trial, the state presented evidence of the earlier robbery, including evidence that the victim of that offense had identified petitioner as the gunman. There was also evidence that petitioner had in his possession at the murders the same gun that had been used in the robbery. The prosecutor argued to the jury in closing that, notwithstanding his acquittal of armed robbery, petitioner had, in fact, committed that offense and had been acquitted only because he had "committed outright perjury" in that case.

In his seventh post-conviction claim, petitioner asserted that trial counsel was inadequate in failing to object to the state's evidence of the Salem robbery, which he asserted was barred from consideration under principles

of issue preclusion.[8] Petitioner's post-conviction trial memorandum on that claim did not include any analysis of issue preclusion; he argued instead that admission of the evidence violated principles of double jeopardy under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution.[9]

The post-conviction court did not address petitioner's double jeopardy argument, but addressed only the claim in the petition that trial counsel's failure to object to evidence of the robbery on issue preclusion grounds was inadequate assistance of counsel. The post-conviction court ruled that evidence of the robbery offense was not barred by that doctrine and was admissible. Additionally, the court reasoned that, given that petitioner had been acquitted of the robbery and that Susbauer had admitted his guilt,

"reasonable counsel could conclude that evidence of the Salem robbery would bolster the defense theory that Susbauer was a violent criminal and instigator, and that petitioner was merely in the wrong place at the wrong time."

On appeal, petitioner asserts that the post-conviction court erred in rejecting his claim that counsel was inadequate in not objecting to the evidence on the ground of issue preclusion. Assuming that petitioner preserved that argument—even though he did not argue it to the post-conviction court—we reject it.

Issue preclusion prevents the relitigation of factual issues decided in a prior proceeding, and can be based on constitutional principles, or statutory or common law principles. *State v. Rogers*, 313 Or 356, 374, 836 P2d 1308 (1992), *cert den*, 507 US 974 (1993) (applying statutory and constitutional issue preclusion principles and noting that ORS 43.160, which has its genesis in common law, applies in criminal cases). *See also State v. Mozorosky*, 277 Or 493, 498, 561 P3d 588 (1977); *State v. Dewey*, 206 Or

---

[8] Although throughout these proceedings the parties and the post-conviction court referred to the principle as "collateral estoppel," since 1990 the principle is referred to as "issue preclusion," *see Drews v. EBI Companies*, 310 Or 134, 139, 795 P2d 531 (1990), and that is how we refer to it in this opinion.

[9] The Fifth Amendment provides, in part, that "[n]o person shall * * * be subject for the same offence to be twice put in jeopardy of life or limb."

496, 504, 292 P2d 799 (1956) (the doctrine of *res judicata* or estoppel by judgment is applicable in criminal cases); *State v. Johnson*, 70 Or App 403, 405-06, 698 P2d 1032 (1984); *State v. Hollandsworth*, 64 Or App 44, 46, 666 P2d 1373 (1983). Petitioner expressly eschews reliance on a constitutionally-based rationale,[10] and does not make a statutory argument. *See* ORS 43.160 ("That only is determined by a former judgment, decree or order which appears upon its face to have been so determined or which was actually and necessarily included therein or necessary thereto.") He instead focuses on the common-law doctrine, which requires a showing of five elements: (1) the issue in the two proceedings is identical; (2) the issue has been actually litigated and was essential to a final decision on the merits in the prior proceeding; (3) the party to be precluded must have had a full and fair opportunity to be heard on the issue; (4) the party to be precluded must have been a party or in privity with a party to the prior proceeding; and (5) the prior proceeding must be the type of proceeding to which courts will give preclusive effect. *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993).

As the party contending that issue preclusion was applicable, petitioner had the burden to establish the facts supporting its application. *See State Farm v. Century Home*,

---

[10] In his reply brief, however, petitioner adds the argument made in his trial memorandum that the state's use of the evidence also violated double jeopardy. Under federal law, the doctrine of "collateral estoppel" is viewed as a component of the ban against double jeopardy. *Mozorosky*, 277 Or at 497-98 (federal double jeopardy protection prohibits retrial for the same crime after judgment of acquittal and multiple prosecutions for different crimes based on the same evidence). The United States Supreme Court explained the concept in *Ashe v. Swenson*, 397 US 436, 90 S Ct 1189, 25 L Ed 2d 469 (1970). In *Ashe*, six players of a card game were simultaneously robbed at gunpoint by three or four men. The suspects, including the petitioner, were charged with separate offenses for each of the six victims. The only element of the crime in dispute was identity, *i.e.*, whether the petitioner was one of the robbers. The state tried the petitioner on one of the counts, and he was acquitted. The state then tried the petitioner on another count, which was identical to the first except that it related to a different victim, and the petitioner was convicted. Once again, the only issue had been whether the petitioner was one of the robbers. *Id.* 379 US at 437-40. The Court held that the state was collaterally estopped under principles of double jeopardy from subjecting the petitioner to a second trial on the identical issue. *Id.* at 444-47.

As the state correctly asserts, the double jeopardy aspect of collateral estoppel announced in *Ashe* is not implicated in this case. Petitioner was not being retried for anything arising from the conduct during the Salem robbery.

275 Or 97, 104, 550 P2d 1185 (1976). Citing *State v. Garcia*, 74 Or App 649, 655, 704 P2d 544, *rev den*, 300 Or 180 (1985) (in the criminal context, the doctrine of collateral estoppel bars *proof* of any fact or issue necessarily decided by a previous verdict), petitioner contends, simply that, because he was acquitted of the robbery, no evidence relating to that charge could be considered in the aggravated murder trial.

The state responds that, to the extent that petitioner preserved his issue preclusion claim, which was asserted in the post-conviction petition but not specifically argued to the post-conviction trial court, it is inapposite and the post-conviction court did not err in rejecting it. We agree with the state that, assuming that petitioner preserved his claim, petitioner's acquittal of the robbery charge did not preclude the consideration of evidence of the robbery in the aggravated murder prosecution.

First, the state established that evidence of petitioner's involvement in the robbery was relevant to the aggravated murder prosecution: The evidence was offered to show petitioner's participation in a crime spree with Susbauer on the night of the murders and to establish that petitioner had been in possession of the murder weapon, which had also been used in the robbery.

Second, petitioner has not shown that consideration of the robbery evidence resulted in a relitigation of facts necessarily determined by his acquittal of the robbery. The ultimate facts to be proven in the aggravated murder trial were different from those litigated in the robbery prosecution. As the Supreme Court explained in *Dewey*,

> "[w]here the second prosecution is for another offense, 'the previous judgment is conclusive only as to those matters which were in fact in issue and actually or necessarily adjudicated. Thus an acquittal of the charge of seduction does not adjudicate the question of sexual intercourse although that was one of the issues in the case, since the acquittal might have been due to the failure to establish other facts essential to a conviction.'"

206 Or at 508 (quoting 2 *Freeman on Judgments* § 648, 1364-65 (5th ed 1925)). Petitioner's acquittal of robbery does not mean that the jury in that case "actually or necessarily"

determined the facts for which the evidence was introduced in the aggravated murder trial—to show petitioner's involvement in a crime spree on the night of the murders and his possession of the murder weapon.

Finally, even if issue preclusion were applicable, there is evidence in the record to support the trial court's finding that trial counsel's failure to object to evidence of the robbery was a tactical decision, and we agree with the post-conviction court's conclusion that, to the extent that the decision not to object was tactical, it was reasonable.

Thus, we conclude that the post-conviction court did not err in rejecting petitioner's issue preclusion argument and in concluding that trial counsel was not inadequate in failing to object to evidence of the robbery. We also conclude, however, that assuming that counsel was inadequate in failing to object, petitioner has not shown that he was prejudiced by the admission of evidence of the robbery.

Petitioner's argument on appeal, that counsel was inadequate in failing to object to the prosecutor's argument to the jury that petitioner perjured himself during the robbery trial, was not asserted in the petition and therefore will not be considered here.

Also in his seventh claim for relief, petitioner contended that trial counsel was inadequate in failing to request removal of a juror who had had contact with the victims' families. The post-conviction court rejected the claim, finding that,

"[w]ith respect to each incident involving [the juror], the trial court and petitioner's trial counsel conducted a thorough inquiry. The record established that no prejudicial communications involving the juror had taken place. Petitioner did not prove that the trial court would have granted a motion to remove the juror. Because the incidents in question were proven to be innocuous, petitioner's trial counsel would not have been successful in such a motion. Petitioner did not prove that his trial counsel provided inadequate assistance or that he suffered prejudice as a result. Petitioner also did not prove that his trial counsel's decision not to challenge [the juror] was not a legitimate

tactical choice based on a perception that she would be a favorable juror for the defense."

We have considered the evidence in the record and conclude that it supports the post-conviction court's findings. Accordingly, we reject petitioner's contention that the post-conviction court erred in denying relief on this claim.

F. *Sixth assignment of error—failure to call a potential witness*

In his sixth assignment, petitioner contends that the post-conviction court erred in rejecting petitioner's contention, raised in his seventh claim for relief, that trial counsel was inadequate and ineffective in failing to present Tracy Reed as a witness or make an offer of proof of her testimony. Petitioner offered the following evidence: In a deposition given in the post-conviction proceeding, petitioner's post-conviction counsel asked co-trial counsel Lance whether the two of them had "talked in the hallway about a Tracy Reed who came forward and indicated she had been raped by John Susbauer?" Lance replied "Yes." Based on that response, petitioner asserted at the post-conviction hearing that trial counsel was constitutionally ineffective in failing to offer proof of, or otherwise admit evidence of, Susbauer's rape of Reed.

The post-conviction court gave several reasons for rejecting that claim:

1. Petitioner did not offer an affidavit or testimony of Reed or otherwise prove what she would have said had she been called as a witness.

2. The state's theory was that both petitioner and Susbauer had raped Bendele. Evidence that Susbauer had raped Reed would not show that petitioner had not raped Bendele and would not have been exculpatory of petitioner, but would have opened the door to evidence of petitioner's prior sexual assaults. Even if Reed might have testified that Susbauer raped her, trial counsel reasonably did not offer such evidence.

3. Evidence of Susbauer's rape of Reed would not have been admissible.

To satisfy a petitioner's burden of proof on a claim that trial counsel was constitutionally inadequate in failing to call a witness to testify, the petitioner must show that (1) the witness would have been available to testify, (2) would have appeared at the time of trial, and (3) would have provided testimony likely to have changed the result of the trial. *See Carias v. State of Oregon*, 148 Or App 540, 546-47, 941 P2d 571 (1997) (petitioner failed to prove prejudice where he failed to show the availability of the witness or to show by affidavit, testimony, or otherwise, what the witness's testimony would have been, to evaluate the likely effect on the trial). *See also New v. Armenakis*, 156 Or App 24, 946 P2d 1101 (1998), *rev den*, 328 Or 594 (1999) (no prejudice shown where the substance of an omitted witness's testimony was not established in the post-conviction proceeding through admissible evidence). Petitioner argues on appeal that Lance's deposition statement satisfied his burden to show that Reed was available, and that Reed's testimony would have been admissible under OEC 404(3) for a noncharacter purpose to show that Susbauer lied about having been forced by petitioner to rape Bendele, from which the jury could have inferred that Susbauer also lied about petitioner having shot the victims.

The state responds that, assuming that trial counsel was ineffective in failing to seek out Reed as a witness, Lance's testimony does not provide the requisite proof of the substance of Reed's potential testimony which, in the absence of further evidence, remains speculative, and deprives the court of the ability to assess how she would have testified and the impact of that testimony. Further, the state asserts, as the post-conviction court found, that petitioner never established that Reed would have been available to testify at the criminal trial.

We conclude that, assuming that trial counsel was inadequate in failing to present the testimony of Reed or to make an offer of proof, petitioner's evidence does not show prejudice. The hearsay evidence, offered through Lance's deposition, of the content of Reed's potential testimony was insufficient to satisfy petitioner's burden to show how she would have testified if called as a witness. *New*, 156 Or App at 29. Further, the inferences that necessarily must be

drawn from Lance's affirmative response to the deposition question are that (1) that Reed would have been available to testify at petitioner's trial and (2) she would have testified in a way that had a tendency or a reasonable probability of affecting the outcome of the case. In the absence of an affidavit by Reed describing her testimony, those inferences are speculative at best, and the post-conviction court was not obligated to make them. We conclude for that reason that the post-conviction court did not err in concluding that petitioner had not established prejudice and in rejecting the claim, and we therefore do not address petitioner's contention that the post-conviction court erred in determining that Reed's testimony, if offered, would not have been admitted.

G. *Seventh assignment of error—claims relating to jury instructions*

In his seventh assignment of error, petitioner asserts that the post-conviction court erred in rejecting two claims relating to jury instructions: (1) that counsel was inadequate in failing to object at trial to the uniform jury instruction on reasonable doubt, Uniform Criminal Jury Instruction 1009, which used the phrase "moral certainty" and which, petitioner contends, misled the jury to believe that it could convict on less than reasonable doubt; and (2) that counsel was inadequate in failing to object to burglary charge instructions that included dual or contradictory specific intent requirements.

We reject petitioner's contention regarding the "moral certainty" uniform jury instruction without discussion. *State v. Williams*, 313 Or 19, 36-38, 828 P2d 1006 (1992) (including the term "moral certainty" in an instruction defining reasonable doubt is not error when the jury could not reasonably have construed the instruction either to decrease the state's burden of proof or allow the jury to base its decision on anything other than the evidence). We move on to consideration of the burglary instruction.

As noted, in addition to aggravated murder, petitioner was charged with multiple other offenses, including two counts of burglary, Count 1 and Count 4, with respect to two different burglaries involving different victims, Johnson and Noble. Those counts alleged that petitioner entered

dwellings and remained unlawfully "with intent to commit the crime of theft or criminal mischief." Petitioner alleged in his seventh claim for relief that counsel was inadequate for "failing to object at trial to jury instructions * * * [w]hich included [d]ual or contradictory specific intent requirements for the burglary counts." Generously interpreted, that claim would appear to be that counsel was inadequate in failing to request instructions that the same 10 jurors must agree regarding which of two underlying crimes—criminal mischief or theft—petitioner intended to commit while in the dwellings. *State v. Boots*, 308 Or 371, 780 P2d 725 (1989).

Petitioner is correct that a concurrence instruction was required, *see State v. Frey*, 248 Or App 1, 273 P3d 143 (2012) (specific crime that defendant intended to commit is a material fact upon which the jury must concur in order to convict defendant of attempted burglary), and we agree that, in light of the state of the law at that time, *State v. Sanders*, 280 Or 685, 572 P2d 1307 (1977), reasonable counsel would have requested the instruction. As we explained in *Frey*, it has long been the law in Oregon that the specific crime that the defendant intended to commit upon entry is a material element of burglary. 248 Or App at 9 (citing *Sanders*, 280 Or at 689). Thus, the failure to request the instruction was inadequate and ineffective assistance of counsel.[11]

The remaining question is whether petitioner has shown prejudice. We reject the post-conviction court's reasoning and the state's contention that there was no prejudice because petitioner's counsel conceded in closing argument at the murder trial that petitioner is "a thief. He's a burglar. He's a liar." Those statements were consistent with the defense strategy that, although petitioner had participated with Susbauer in the crime spree, he did not murder the victims. But those statements did not amount to an admission that petitioner had in fact carried out the particular burglaries alleged in the indictment. Additionally, petitioner's subsequent admission at sentencing of his involvement in the burglaries does not bear on the prejudicial effect of not giving a concurrence instruction at trial. *See Bogle v. Armenakis*,

---

[11] Although the record shows that at least 10 jurors voted for each guilty verdict on the burglary counts, it is not known whether the same 10 jurors agreed on the underlying crimes.

172 Or App 55, 64, 18 P3d 390 (2001) (failure to give *Boots* instruction had tendency to affect result of prosecution).

As petitioner points out, in addition to the burglary convictions, the jury also found petitioner guilty of two counts of theft relating to the Johnson burglary (Count 1), and three counts of theft and one count of criminal mischief related to the Noble burglary (Count 4). In petitioner's view, those guilty verdicts do not cure the failure to give the concurrence instruction. It is possible, petitioner contends, that with respect to the Johnson burglary (Count 1) there were two jurors who found petitioner not guilty of theft but guilty of burglary based on an intent to commit criminal mischief, while other jurors voted guilty based on an intent to commit theft. And it is possible, petitioner contends, that with respect to the Noble burglary (Count 4), the 10 jurors who found petitioner guilty of burglary were not the same 10 who found him guilty of theft and criminal mischief. We agree with petitioner that those scenarios are *possible*; in the absence of a poll of the jurors, it is impossible to know with certainty on this record whether the same 10 jurors agreed on the underlying offense petitioner intended to commit in each of the two burglaries.

Nonetheless, the state asserts that the *uncontested* evidence of petitioner's participation in the burglaries is so overwhelming that no reasonable jury could have found petitioner not guilty. If there is "overwhelming evidence of * * * guilt," even serious errors could not reasonably change the result. *Davis*, 151 Or App at 72 (trial counsel's failure to object to the petitioner being held in shackles in presence of the jury did not require post-conviction relief). Petitioner does not dispute the uncontested nature of the evidence, but replies that "the state does not cite *which* evidence proved *which* underlying crime petitioner intended to commit upon entering the dwellings at issue in this case[.]"[12] (Emphasis

---

[12] As earlier quoted, 255 Or App at 255-56, the Supreme Court's opinion summarized the facts underlying the two burglary counts, in the light most favorable to the state:

"As pertinent here, on December 14, 1995, defendant and Susbauer broke into a woman's home, stole several thousand dollars worth of her property, and slashed a couch and a stereo speaker with a knife before leaving.

"* * * * *

in original.) We agree with petitioner. In the absence of a concurrence instruction, it is not possible on this record to determine which underlying offense formed the basis for each of the burglary convictions. Although our conclusion with respect to this claim does not affect petitioner's aggravated murder convictions and resulting death sentences, we agree with petitioner that he has an interest in having the record reflect a correct resolution of the burglary charges. *See State v. Link*, 346 Or 187, 199-200, 208 P3d 936 (2009). Accordingly, we conclude that petitioner has established prejudice and is entitled to post-conviction relief on the burglary convictions.

H.   *Petitioner's supplemental brief—"natural and probable consequences" instruction*

During the guilt phase of petitioner's trial, the jury was instructed that a person who aids and abets another in committing a crime is also criminally responsible for any act or other crime committed "as a natural and probable consequence" of the planning, preparation, or commission of the intended crime. In the seventh claim of his post-conviction petition, petitioner asserted that trial counsel was inadequate in failing to object to jury instructions "[w]hich did not specify that the Petitioner was being tried as an accomplice, a status which involves a different or additional requirement of proof, such as specific intent to facilitate the commission of the crime by another." In rejecting that claim, the post-conviction court found, among other facts,[13] that "[t]he trial court instructed the jury on criminal liability for the conduct of another person pursuant to ORS 161.150 and ORS 161.155." The post-conviction court found that trial counsel reasonably did not object to that instruction,

---

"On December 19, 1995, defendant and Susbauer broke into another house and again stole thousands of dollars worth of property including, among other things, a rabbit-fur jacket, a .38 caliber Taurus revolver with wooden grips, and 25 rounds of ammunition for the revolver. Before they left, they again slashed the furniture with a knife."

(Quoting *Hale*, 335 Or at 614.)

[13] The post-conviction court also found that the jury heard evidence sufficient to allow it to find that petitioner personally committed all of the crimes for which he was convicted and that he aided and abetted Susbauer in the commission of some of the crimes.

because it was legally correct and that, for the same reason, petitioner did not suffer any prejudice.

In a supplemental *pro se* brief, among a long list of assertions in his second supplemental *pro se* assignment of error,[14] petitioner argued that trial counsel was inadequate in failing to object to "the accomplice instructions [that] allowed a confusion of theories and intents." After the post-conviction court entered its judgment in 2009, the Supreme Court decided *State v. Lopez-Minjarez*, 350 Or 576, 260 P3d 439 (2011). Petitioner has filed a memorandum of additional authorities, arguing that *Lopez-Minijarez* requires reversal of petitioner's convictions. In *Lopez-Minijarez*, the Supreme Court reversed the defendant's convictions because the "natural and probable consequences" portion of the uniform jury instruction on aiding and abetting incorrectly stated the principles of accomplice liability under Oregon law, as it instructed the jury that it could find the defendant guilty on a theory of accomplice liability, whether or not he intended to commit or aid in the commission of the underlying offense. *Id.* at 583. Petitioner contends that, likewise, his convictions here must be overturned, because a similar instruction was given, and counsel was ineffective in failing to object.

Assuming that the post-conviction petition raised the inadequacy of counsel claim now asserted and that petitioner's supplemental *pro se* brief adequately assigned error to the post-conviction court's rejection of the claim, the post-conviction court did not err in rejecting it. As the post-conviction court found, the "natural and probable consequences" instruction was correct when given in 1998. Until this court's 2010 opinion and the Supreme Court's 2011 opinion in *Lopez-Minjarez*, the "natural and probable consequences" instruction was a standard instruction included in the uniform criminal jury instructions and had been described in *State v. Gibson*, 252 Or 241, 246, 448 P2d 534 (1968), as "a correct statement of the law." The failure of trial counsel to object to it was a reasonable exercise of professional skill and judgment. *See Wells v. Peterson*, 315

---

[14] In his first supplemental *pro se* assignment of error, petitioner asserts error with respect to the exclusion of testimony of a defense expert. Petitioner's second supplemental *pro se* assignment of error lists numerous unrelated investigative and trial errors and prosecutorial misconduct with some argument in a footnote.

Or 233, 236, 844 P2d 192 (1992) (failure of criminal trial counsel to contend that statute prohibited the sentence was not inadequate assistance of counsel, because at the time of trial the meaning of the statute was not clearly settled and reasonable counsel could have disagreed about whether to make the argument at the time that the original case was tried). Accordingly, we conclude that trial counsel was not inadequate in failing to object to the "natural and probable consequences" instruction. We further conclude that, assuming that trial counsel was inadequate in failing to object, in view of the evidence that petitioner was the primary actor, as described in the Supreme Court's opinion affirming the death sentence, the uniform criminal jury instruction on aiding and abetting did not have a tendency to affect the result of the prosecution or cause actual prejudice to the defense.

We have considered the remaining assignments of error both in petitioner's brief filed by counsel[15] and in his supplemental *pro se* brief, and we reject them without further discussion.

Convictions of burglary reversed and remanded; otherwise affirmed.

---

[15] Petitioner's eighth assignment asserts inadequacy of counsel based on failure to demur to Oregon's death penalty statute on grounds that have been previously rejected. The ninth assignment asserts that petitioner was inadequate in failing to investigate potential mitigation witnesses. Petitioner's tenth assignment, which was not preserved, asserts inadequacy of counsel during the penalty phase of trial based on counsel's failure to assert in closing arguments that codefendant Susbauer likely would not receive the death penalty. In his eleventh assignment, petitioner asserts that appellate counsel was inadequate in failing to assign error on direct appeal to the trial court's preclusion of argument about codefendant Susbauer having a collection of women's underwear. Petitioner's twelfth assignment of error asserts three stand-alone challenges to the imposition of the death penalty in the face of codefendant Susbauer's life sentence. In his thirteenth assignment of error, petitioner raises an Eighth Amendment challenge to the manner of conducting Oregon's death penalty by lethal injection. Petitioner's fourteenth assignment asserts the appearance bias of the trial court. In his fifteenth assignment, petitioner asserts prosecutorial misconduct and trial court error relating to conduct and rulings with respect to evidence concerning codefendant Susbauer. In his sixteenth assignment of error, petitioner challenges the Supreme Court's opinion in *Palmer*. We have considered each assignment and reject them as not preserved, as barred under ORS 138.550(2) and *Palmer*, or on their merits.